**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| TRENCE ROBINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-1431-JAR-GLR |
| | ) | |
| CITY OF ARKANSAS CITY, KANSAS | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS MOTION**
**TO COMPEL PRODUCTION OF DOCUMENTS AND FOR EXPENSES**

**INTRODUCTION**

As set forth in the factual and discovery summary of Robinson's Amended Memorandum in Opposition to Defendant's Motion for Protective Order Regarding Subpoena Issue to Calvin Weeks and in Support of Plaintiff's Request for Expenses [Doc. 96], the City has refused to search for and produce clearly responsive documents and, in fact, has taken affirmative steps to withhold such documents from Robinson. Indeed, throughout discovery, the City has effectively taken the position that unless Robinson specifically identifies a document in advance, it has no obligation to search for otherwise responsive information. What makes the City's conduct more alarming is that even where Robinson has been able to specifically identify documents—which he obtained from third parties and which the City should have located and produced—the City apparently has felt no obligation to locate and produce those or similar documents from its own files. This conduct is exactly the type of gamesmanship that the rules of civil procedure and the courts that interpret them find abhorrent. See Lee v. Max Int'l, LLC, No. 10-4129, 2011 WL 1651640, at *4 (10th Cir. May 3, 2011) ("Discovery is not supposed to be a shell game, where

1

the hidden ball is moved round and round and only revealed after so many false guesses are made and so much money is squandered." ).

Robinson regrets the length and complexity of this memorandum.  However, this is a problem of the City's making.  Given the positions the City took, both during the events giving rise to this lawsuit and during this litigation, the City's refusal to locate and produce all responsive documents is utterly unjustified.  From the very beginning of this dispute, the City placed certain documents right in the bulls-eye of the relevance circle when it accused Robinson of presenting a fabricated job description to the Mediation Committee.  Thus, Robinson's efforts to obtain information—including email communications by and among City representatives— related to the authenticity of the job descriptions that the City presented to the Mediation Committee—documents that the electronic evidence shows were altered from their originals—is more than just a fishing expedition as the City has claimed.  Similarly, as it did to the Mediation Committee, the City continues to contend in the Pretrial Order that it has never had the position of Sanitation Foreman in the City's Pay Classification Plan, and thus Robinson could not have been promoted to or served in such a position.  Given this contention, one would expect the City to search for all documents related to this subject; but the City has essentially refused at every turn to even look for the simplest of such documents—such as emails from Gary Baugher, Robinson's department head, and perhaps others where Robinson is identified explicitly as the Sanitation Forman.

If this motion could be stated in one sentence, it would be as follows:  Robinson respectfully requests that Court compel the City to search for and produce all documents: related to Robinson's employment with the City; related to Robinson's promotion to the position of Sanitation Foreman; related to Robinson's performance of the duties of the Foreman in the City's

Sanitation Division; related to the City's Pay Classification Plan during the relevant time period; and related to Gary Baugher's efforts to re-write job descriptions for the supervisors in his department, including those that were given to Robinson, Randy Jacobs, Tony Tapia, and Charles Blass.  This request seems straightforward, but the City's dilatory and harassing tactics have forced Robinson and his counsel to expend enormous resources to cajole the City into complying with its discovery obligations, which for some of the documents it would have taken the City less than 10 minutes to highlight, to right click, to copy, to paste on a disk, and to produce.  Surely, this is not how discovery is supposed to work under the Federal Rules of Civil Procedure.  See Lane v. Page, No. 06-1071, 2011 WL 1004825, at *4 (D.N.M. Feb. 10, 2011) ("The Federal Rules of Civil Procedure embrace a policy of encouraging broad discovery, and exhibit little patience for gamesmanship and attempts to withhold discoverable materials and information.  Such gamesmanship produces needless delay, wasting the Court's and the parties' time, contrary to the purpose of the Federal Rules of Civil Procedure").  It is time for the games to stop and for the City to fully comply with its discovery obligations.

## FACTUAL BACKGROUND

The factual background underscores the relevance and necessity of the documents Robinson requested from the City in this case—electronically stored information (ESI), in particular.  Robinson previously set forth for the Court the full history of Robinson's employment with the City, his 2007 promotion to Sanitation Foreman, and the City's continued denial of the compensation owed to him, as well as the City's underhanded tactics—including the alteration of key documents and false *ex parte* communications with committee members— that misled the City's mediation committee and undermined the committee's proceedings

regarding Robinson's internal grievance.  [*See* Doc. 96, at 3-11.]  Robinson incorporates his prior recitation of the factual background of this case.

<strong><u>D</u>ISCOVERY <u>B</u>ACKGROUND</strong>

**<u>Plaintiff's Document Requests</u>**

On April 11, 2011, Robinson served on the City document requests seeking various categories of paper documents and ESI, including, among others, all electronic files and e-mails related to Robinson's employment and Baugher's ".pst" files concerning or reflecting Robinson's employment.  These requests are likely to lead to discoverable information relevant to Robinson's claims that his civil rights have been violated.  Specifically, Robinson requested:

> **REQUEST TO PRODUCE NO. 1**:
> Any and all documents related to Robinson's employment with the City of Arkansas City, Kansas, including, but not limited to, all personnel files, electronic files, e-mails, and correspondence from January 1, 2006 to the present.
>
> **REQUEST TO PRODUCE NO. 2:**
> Any and all documents and things relating to communications by and between the City and Mark Patton, Judy Reedy, Charles Jennings, or any combination thereof concerning any aspect of the December 8, 2008 and December 30, 2008 hearings before the Mediation Committee regarding Robinson or any aspect of the subsequent written decision by the Mediation Committee.
>
> **REQUEST TO PRODUCE NO. 3:**
> Any and all documents maintained by any manager and/or supervisor, including human resources, concerning Robinson, including, but not limited to, e-mails, payroll records, calendars, notes, memoranda, claim files, performance evaluations, disciplinary documents, safety reports, complaints filed by Robinson, pay grade documents, and correspondence from January 1, 2006 to the present.
>
> **REQUEST TO PRODUCE NO. 4:**
> Any and all employee handbooks, policy statements, procedure manuals or statement, and any other documents reflecting or concerning the City's employment policies and procedures in effect at any time from January 1, 1994 to the present.
>
> **REQUEST TO PRODUCE NO. 5:**
> Any and all documents that reflect the organizational structure, and/or management of the City, and any changes in the same, from January 1, 1994 to the present.

**REQUEST TO PRODUCE NO. 6:**

Copies of any notes or statements taken during interviews of any individual, whether such documents are in documentary form, or recorded via audio or video means, which were taken by you or any agent working on your behalf that relate to any allegation at issue in the Complaint.

**REQUEST TO PRODUCE NO. 7:**

Any and all ".pst" files of Gary Baugher concerning or reflecting Robinson's employment by the City from January 1, 2006 to the present.

**REQUEST TO PRODUCE NO. 8:**

Any and all documents reflecting any Job Description and any Performance Enhancement Program Review tendered by the City, either through Gary Baugher or any other employee of the City, to Robinson, Tony Tapia, and Randy Jacobs from January 1, 2006 to the present. Plaintiff specifically requests that these documents be produced in both native electronic format and hard copy.

**REQUEST TO PRODUCE NO. 9:**

Any and all files, documents, memoranda, notes, or e-mails concerning, relating to, or discussing the positions of Sanitation Foreman, Labor Foreman, or Assistant Superintendent Storm Water from January 1, 2006 to the present.

**REQUEST TO PRODUCE NO. 10:**

Any and all files, documents, memoranda, notes, or e-mails created or revised since January 1, 2006, discussing Robinson.

**REQUEST TO PRODUCE NO. 11:**

Any and all documents (except those subject to privilege) that support the City's defenses in this case.

[Plaintiff's First Request for Production of Documents ("Plaintiff's First Request for Documents"), attached as Ex. A.]

The City responded to Plaintiff's First Request for Documents on May 11, 2011.  In its response, the City produced only limited e-mail correspondence related to the 2008 grievance procedure, none of which were in native format, and all of which appear to have come from its

counsel's copy of those communications, not its own.[1]  The City did not at that time produce the electronic form of any of the disputed Microsoft Word documents, i.e., the various versions of the job descriptions or the performance evaluation forms, even though—unbeknownst to Robinson at the time—the City's expert had located numerous such electronic documents, extracted them with metadata intact, and sent them to the City's Counsel on March 31, 2011, before Robinson even served his discovery requests.  [*See* Expert Report, attached as Ex. C.] When the City responded to Robinson's initial discovery on May 11, it did not produce any ESI whatsoever or even indicate that any of the hard copy documents that it had produced had been printed and produced from the City's ESI.  Instead, the City made multiple general objections and recited the standard litany of various boilerplate objections in response to each individual document request (except for Request No. 10, to which it did not object).  [Defendant's Responses and Objections to Plaintiff's First Request for Production of Documents ("Defendant's Response to First Request for Documents"), attached as Ex. D.]

On May 17, 2011, after reviewing the City's responses, Robinson's counsel, Todd Tedesco, had a 1.5 hour conference call to confer with Trinidad Galdean, counsel for the City, regarding the City's May 11 Response and Robinson's concerns about the City's production. [Affidavit of Todd N. Tedesco, attached as Ex. E, para. 2.]  Tedesco questioned the apparent non-production of any ESI.  [*Id.*]  He also sought an explanation regarding several of the hard-copy documents produced by the City, which were versions of job description documents that

---

[1] This is significant because, unless the City copied its counsel on a communication, the communication was not produced.  Indeed, via a subpoena to Mark Paton ("Paton") (mediation panel member), Robinson obtained evidence of a clearly responsive e-mail communication from Steve Archer ("Archer") (former City Manager) to Paton that the City has not produced from its own files (either in hard copy or electronic form).  [*See* 1/5/2009 Archer E-mail to Paton, attached as Ex. B.]  Either the City chose not to produce this document or, more likely, the City did not conduct the necessary review of its own electronic files in order to locate it.  In either case, the City's conduct violated the Federal Rules of Civil Procedure.

the City previously told the Mediation Committee did not exist.  [*Id.* at para. 4.]  Galdean explained that one of the hard-copy documents actually had been printed and produced from an electronic source.  [*Id.*]  Following an extended discussion about whether the City would produce any ESI short of a court order, Galdean committed to at least producing the native Microsoft Word files for the job descriptions that the City presented to the Mediation Committee.  [*Id.* at para. 5]  At the conclusion of the conference, however, Galdean equivocated on the amount of time the City needed to produce the files.  [*Id.*]  When Tedesco questioned why he could not commit to simply copying the native files from Baugher's laptop hard drive to a disc for immediate delivery, Galdean indicated that his firm did not have possession of the computer because it was "with an expert."  [*Id.*]

During the May 17 call, Tedesco also inquired about City's failure to produce any statements by witnesses in response to Robinson's Request No. 6.  [Tedesco Aff., Ex. E, at para. 6.]  In particular, Tedesco asked the City to explain why it had not produced the deposition transcripts from likely witnesses in this case who had been deposed in another pending employment-related case brought by Mary Bartlett, the City's former Public Service Secretary.[2] [*Id.*]  Galdean conceded that such transcripts were responsive to Request No. 6, but he indicated that he wanted to obtain approval from the opposing counsel in that case, David Alegria, before producing the transcripts, purportedly because Galdean had concerns about violating the protective order in that case.  [*Id.*]  As it turned out, despite Galdean's representations to Tedesco during a June 2, 2011, conference call that Galdean had tried unsuccessfully to reach Alegria,

---

[2] Mary Bartlett's testimony is clearly relevant.  Robinson identified Mary Bartlett in his initial disclosures as a person likely to possess discoverable information.   The City in turn identified her as a witness in its disclosures by designating "by reference all witnesses identified by Plaintiff."  Mary Bartlett testified during Robinson's December 2008 grievance procedure and has her own wrongful discharge suit pending against the City [Case No. 10-4064].

Alegria told Tedesco in early August that no one from Kutak Rock had approached him about producing the deposition transcripts and that he had no objection to Kutak Rock producing them to Robinson in this case.  [*Id.* at para. 7.]  Tedesco relayed that information to Galdean, and asked the City to produce the transcripts.  [*Id.*; 8/9/2011 Tedesco e-mail to City's Counsel, attached as Ex. F.]  He followed up with Galdean again the following week, this time forwarding an e-mail he had received from Alegria, in which Alegria stated that he did not object to the production and that Kutak Rock had never contacted him regarding the production.  [Tedesco Aff., Ex. E, at para. 8; 8/15/2011 Tedesco e-mail to City's Counsel, attached as Ex. G.]  The City never produced the deposition transcripts or even responded to these e-mails.

Because the various explanations the City provided regarding its production and the lack of any response ESI during the May 17 conference were unsatisfactory, Tedesco informed Galdean during the call that Robinson intended to serve the City a Rule 30(b)(6) notice to discuss the City's efforts to locate and to produce responsive documents, including ESI.  [Tedesco Aff., Ex. E, at para. 3.]  Tedesco even discussed with Galdean the topics that the Rule 30(b)(6) deposition would cover so that Galdean could begin to consider the appropriate representative for the City.  [*Id.*]

On May 20, 2011, shortly after the May 17 meet and confer, the City produced certain selected native Word documents that had been stored either on Baugher's laptop hard drive or an external hard drive that, in addition to other folders and documents, contained a backup of

Baugher's laptop hard drive that apparently was made on August 26, 2008.[3]   These documents were clearly responsive and included the documents with their associated metadata that were initially requested by the Mediation Committee at the time of the grievance hearing.   In this supplemental production, the City did not, however, produce any other ESI or even indicate that such a production was forthcoming.   Indeed, although the City agreed during the May 17 call to produce the native Microsoft Word files, Galdean affirmatively stated during that call that the City did not intend to produce any other documents.   [Tedesco Aff., Ex. E, at para. 9.]

## The 30(b)(6) Deposition[4]

Consistent with Tedesco's representations during the parties' May 17 call, Robinson served a Rule 30(b)(6) deposition notice to the City on May 24, 2011 [Doc. 20] and, after conferring with the City, served an amended notice on June 6, 2011 [Doc. 29].   The amended notice required the City to designate someone to testify on three specific topics: 1) the City's efforts to locate and produce ESI; 2) the City's information management systems; and 3) its electronic communication systems.   [*See id.*]   Robinson needed to explore the City's discovery efforts because he did not want to file a motion to compel if, in fact, the City had searched for and produced everything to which it had access.   As it turns out, the City had not produced all responsive documents to which it had access.

---

[3] Although the City produced ESI from the "laptop backup," the fact that the City created the backup on the external hard drive on August 26, 2008, was not revealed by the City either when it produced the documents or even when its Rule 30(b)(6) witness testified on a related subject.   Instead, the existence of the separate hard drive with the date-specific backup was only revealed within one of the exhibits attached to the City's expert's report.   The fact that the City had made such a backup months **before** the grievance hearing even commenced further undermines the City's various complaints about the cost to produce ESI.

[4] Additional facts about the City's Rule 30(b)(6) testimony that relate only to the issue of the City's failure to present a knowledgeable representative are stated in Part III, below.

The City designated Matt Metzinger ("Metzinger") as its 30(b)(6) representative, and his deposition commenced on June 9, 2011.  Metzinger testified that the City had made some efforts to preserve and to collect some sources of potentially responsive ESI.  In February 2009, the City took Baugher's laptop ("pre-February 2009 laptop") out of service and subsequently sent it to Digital Mountain for preservation, along with two other electronic storage devices containing ESI from Baugher.  [Metzinger Depo. 35:18-37:6, attached as Ex. H.]  Using a "seed copy" of Baugher's pre-February 2009 laptop, the City set up a new laptop ("post-February 2009 laptop") for Baugher's continued work for the City that contained all of the same files as his old laptop (as altered over time by subsequent edits), plus any new information added since February 2009.  [*Id.* at 39:7-20; 40:14 – 21.]  In approximately March 2010, the City terminated Baugher's employment, and it took his post-February 2009 laptop out of service and placed it in the City's vault for preservation.  [*Id.* at 40:22-41:12.]  Sometime in April 2011, Kutak Rock contacted Metzinger and asked him, as the City's IT employee, to provide a copy of Baugher's .pst files.  [*Id.* at 53:11-23.]  Metzinger copied .pst files from the City's exchange server for Baugher and for three other City employees: Steve Archer, Marla McFarland, and Doug Russell.  [*Id.* at 56:13-57:1.]  He also copied each of these individual's "user's file folder," in other words, "their file storage on the City's server" [*id.* at 63:9-13], and provided the network .pst and user files and Baugher's post-February 2009 laptop to Kutak Rock [*id.* at 62:16-24; 66:24-67:7].  The City did not provide any other electronic data to its counsel.  [*Id.* at 64:14-18.]  It did not contact Digital Mountain to see what responsive .pst files or other data it might have had in its possession [*id.* at 54:16-25], nor did it make any effort to locate local .pst files or other documents that the custodians might have saved to their local hard drives [*id.* at 64:19-65:7].

As for the collection of paper documents, Metzinger testified that the City only collected documents from the filing cabinets in McFarland's office.  [*Id.* at 72:7-16.]  But the City failed to locate and to produce even certain paper documents specifically identified elsewhere in the City's production.  [*Id.* at 132:20-134:3.]

No City employee ever performed any searches on any of the ESI the City sent to Digital Mountain or provided to its counsel.  [*Id.* at 42:15-43:5; 62:7 - 17; 73:23-74:8; 112:20-24.] Metzinger could not say specifically what keywords Digital Mountain used to search the City's ESI in its possession [*id.* at 47:1-6], and he knew only that the Kutak Rock had searched the City's ESI in its possession using some sort of software and some keywords [*id.* at 68:5-8; 80:18-81:3].  The City understood that the ESI it delivered to Kutak Rock contained responsive documents [*id.* at 81:18-23; 88:15-18; 89:14-19], but Galdean instructed Metzinger not to answer questions about any aspect of those documents, including when, if ever, the City planned to produce them.  [*E.g.*, *id.* at 88:19-89:1, 89:20-91:22.]  When the question was posed to Galdean directly, he also refused to provide any information.  [*Id.* at 91:23-92:22.]

The next day, on Friday, June 10, shortly before 5 PM, the City served supplemental disclosures, which included several hundred pages of hard copy documents, some of which were duplicative of previous documents that had been produced, and a disk that included 116 individual e-mail files ("June 16 email disk").[5]  Notably, the City's supplemental production did

---

[5] Some of the e-mail files appear to be taken only from the custodians' inboxes, not their sent-items folder, which is important because in some cases, e-mail attachments that were originally attached to the sent messages were not produced when only the "reply" (without attachments) appeared in a custodian's inbox.  The June 16 email disk was later recalled by the City pursuant to the "claw back" provision contained in the Protective Order, because the City claimed that nearly 25% of the messages were privileged.  Many of these "privileged" communications are subject to Robinson's pending motion to compel.  [Doc. 98.]  The disk was replaced with a new disk containing 87 e-mail files, including numerous duplicates (Bates No. A09488).

not include certain e-mail communications that Robinson's counsel obtained from third-parties and specifically highlighted during the City's Rule 30(b)(6) deposition and that should have been found in the City's ESI.  [*See, e.g.*, Metzinger Depo., Ex. H, 143:6-21.]  That same day, during a telephone call regarding the City's supplemental disclosure, Robinson's counsel again raised the question of when the City intended to produce the additional communications and material that its 30(b)(6) witness said that Kutak Rock had in his possession (including the specific e-mail messages Robinson's counsel had obtained from other sources).   Galdean again refused to answer.  And, to this day, the City still has not produced these documents.

The following Monday, June 13, 2011, defendant produced additional documents in a supplemental production, restating its prior boilerplate objections.   [*See* Defendant's Supplemental Responses to Plaintiff's First Request for Production of Documents ("Supp. Responses"), attached as Ex. I.]  This production included eight hard copy documents and a disk containing seven Microsoft Word documents.  But, once again, this supplemental response did not include any e-mail, whether in either static or electronic format.  In fact, the City represented that no other responsive e-mails exist, even though the City's own Rule 30(b)(6) witness admitted that he personally delivered the files containing such documents to the City's counsel in April 2011.

**The Disclosure of the City's Expert**

Following the 30(b)(6) deposition, Robinson was prepared to file a motion to compel the production of documents responsive to his First Request for Documents and had actually sought leave of the Court to do so given the lack of certainty with respect to the filing deadline because

of the Rule 30(b)(6) deposition.   [Doc. 45.][6]   The City on June 16, 2011, however, notified Robinson that it was going to submit an expert report.   When Robinson's counsel inquired that day about the subject matter of the report, the City's counsel Jessica Garner stated that "the subject matter of the expert's testimony will be regarding the forensic examination of Gary Baugher's computer and devices by Calvin Weeks," which necessitated a delay in Robinson's motion to compel. [Garner 6/16/2011 E-mail to Tedesco, attached as Ex. K.].   The City produced Weeks' expert report on June 20, 2011.   [Weeks' Expert Report, attached as Ex. C.]   Weeks' report describes Digital Mountain's efforts to locate and to produce ESI on the City's behalf and opines that the "preservation and searches were conducted using industry standard tools and methodologies."   [*Id.*]

The City, through Digital Mountain, conducted two discrete searches on the Baugher electronic storage devices in its possession.   However, Weeks' expert report revealed several shocking shortcomings in the City's efforts to discharge its discovery duties.

Digital Mountain's initial search was conducted on March 30-31, 2011, before Robinson ever served any discovery in this case.   [Weeks' Expert Report, Ex. C at 1-2.]   The date of this initial search highlights the first shortcoming in the City's efforts.   The searches themselves could not have been constructed for the purpose of identifying documents responsive to Robinson's requests for production.   In fact, the expert report states that the purpose of the

---

[6] The parties subsequently preserved Robinson's right to file this Motion at some time after the deposition of the City's expert on two separate occasions.   First, in the parties' Joint Motion for Limited Leave to Conduct Depositions Outside of Discovery Deadline, the parties noted, "Defendant has agreed to a requested extension of time for Plaintiff to file a motion to compel related to the production of certain documents until after the deposition of Calvin Weeks." [Doc. 64, at 1.]   Second, in the parties' proposed Pretrial Order, they noted that this motion to compel was forthcoming, stating, "Having now completed the deposition of Defendant's expert, Plaintiff intends to file a motion to compel relating to Defendant's production of documents and related ESI."   [Proposed Pretrial Order, attached as Ex. J.]

March 2011 searches was exclusively to find "(1) job descriptions for the position of Sanitation Foreman, Labor Foreman, or Foreman and (2) performance evaluations/reviews for the employee Trence Robinson during the years 2007 and 2008." [*Id.* at 1.]  This is consistent with the City's March 28, 2011, instructions to Digital Mountain, explaining that the City was "attempting to locate in Word format" the files corresponding to certain PDF documents. [3/8/2011-6/8/2011 E-mail between Kutak Rock and Digital Mountain, attached as Ex. L.]

Based on explicit directions from the City's counsel, Digital Mountain confined its searches essentially to only the Word documents stored on the devices, either in a folder or attached to an e-mail communication in Baugher's ".pst" file, and the handful of PDF documents that were searchable.  As confirmed by Weeks at his deposition, the search did not extend to other types of information such as the many non-searchable PDF documents or **any** of the actual content of Baugher's e-mail communications.  [*See* Weeks Depo., Ex. M at 261:17-267:21; *see also* 3/31/2011 E-mail from Digital Mountain to Kutak Rock (stating the "maximum additional cost" to search the PDF documents was $856), attached as Ex. N; and 3/31/2011 E-mail exchange between Kutak Rock and Digital Mountain (instructing Digital Mountain not to proceed with search of PDF documents), attached as Ex. O.]  Surely, one could imagine that there might be responsive documents in e-mails between Baugher and Russell, Baugher and Archer, or Baugher and some other third-party in which Robinson's role (in the short-term or the long-term) in the Sanitation Department was discussed.  But, the City did not even look for such information as required by the rules.

Digital Mountain arbitrarily decided that the "most optimal and inclusive" search would involve only two search terms:    (SANITATION FOREMAN & JOB CODE) or (PERFORMANCE ENHANCEMENT PROGRAM REVIEW).  [Weeks' Expert Report, Ex. C,

14

at 1-2.]  While these remarkably restrictive search terms admittedly would locate some relevant documents, they undoubtedly fail to identify countless other responsive documents.  For example, "Foreman", "Robinson", or "Trence" searched separately might yield a plethora of additional responsive material.  In fact, Digital Mountain's test searches, using various combinations of search terms, identified 48 documents, only 5 of which were responsive to the two search terms it ultimately settled on.  [*Id.*]  For example, the term "(('job description') and ('labor foreman' or 'sanitation foreman' or 'foreman'))" produced thirty-one hits and "(('Sanitation foreman')) and ('Trence Robinson')" produced eleven hits.  [*Id.*]  All 48 documents identified by the various searches were sent, with metadata, to the City on March 31, 2011, but, to Robinson's knowledge, all 48 documents have not been produced to it.[7]  The City's keyword approach also failed to consider other simple, reasonable search techniques, such as, for example, opening a user's .pst file, sorting the messages by sender or recipient and individually reviewing for messages sent to or from specific individuals.

Digital Mountain's second search, its only post-discovery search, was an attempt on May 17, 2011, to identify the electronic files that correlated to three specific printed job descriptions the City had given to the Mediation Committee in 2008 and had produced to Robinson in this litigation.  [Weeks' Expert Report, Ex. C, at 2.]  While the documents identified certainly are responsive to Robinson's requests, the City made no efforts to find the electronic counterparts of any other printed documents the City produced or to find any document that had not already been produced in paper format—an entire universe of equally responsive but still unproduced documents.

---

[7] In fact, of the 48 electronic documents, the City produced only seven in its June 13, 2011, Supplemental Production.

**The Deposition Subpoena Duces Tecum to the City's Expert**

The City's absolute deference to Digital Mountain to locate and to produce responsive documents and Digital Mountain's woefully inadequate searches, as described in Weeks' expert report, thus necessitated Weeks' deposition to determine precisely what efforts Digital Mountain made to locate responsive documents and to explore what additional efforts it could and should have made.  Because Weeks' deposition was central to the issue of the adequacy of the City's responses to the First Requests for Production, the parties agreed to extend the time to file a motion to compel as to those responses until Weeks could be deposed.  [Doc. 64, ¶4; Watson 6/27/2011 E-mail to Galdean, attached as Ex. P.]

On July 29, 2011, Weeks appeared for his deposition.  He testified that his expert report summarized all of the search activities Digital Mountain undertook on the City's behalf.  [Weeks Depo. 271:23-272:6, attached as Ex. M.]  He also testified that he had never seen Robinson's requests for production and that his searches were not constructed to locate documents responsive to those requests.  [*Id.* at 270:24-271:4.]  He confirmed that Digital Mountain was asked only to locate copies of certain specific Microsoft Word documents, and that it was never asked to conduct—and it never conducted—a comprehensive keyword search for documents relating to Robinson.  [*Id.* at 276:21-277:12; 277:18-279:24.]

**Summary of the City's Production to Date**

The City has refused to locate and to produce numerous documents responsive to Robinson's Requests for Production.  In fact, to date, the City has produced (in its initial disclosures and responses to production) a total of (by Robinson's count) 6,717 pages of electronic and print documents.  But nearly all of these documents were items specifically identified by Robinson, such as Robinson's personnel documents (1,957 pages); the personnel

files of other City personnel requested by Robinson (3,316 pages); City budgets, ordinances, handbooks, and organization charts (218 pages); job descriptions and performance evaluations (360 pages); and KHRC-related documents (520 pages).  Once these documents are accounted for, it is clear that the City produced <u>less than 350 pages</u> of documents, including ESI, for which it would have had to actively search.

The City's deliberate discovery blockade has imposed great delay and cost on these proceedings.  The Court should grant Robinson's motion to compel and order the production of forensic copies of the City's ESI and award it expenses for the City's discovery violations.

## ARGUMENT AND AUTHORITY

Neither the City nor any of its agents ever conducted a thorough investigation to identify repositories of potentially responsive documents, including ESI.  Neither the City nor any of its agents ever conducted a reasonable search even of the documents and ESI it did collect. Compounding these errors, when Robinson attempted to clarify the scope of the City's efforts to locate and to produce responsive documents through a Rule 30(b)(6) witness, the City produced a totally unprepared representative who was unable to speak to any issue outside of his own limited, personal knowledge.  The absolute failure of the City and its counsel to live up to their discovery obligations—indicative of the City's ongoing discovery abuses—requires this Court to grant Robinson's motion to compel and award him his reasonable expenses.

## I.   THE CITY AND ITS COUNSEL VIOLATED OBLIGATIONS TO LOCATE AND TO PRODUCE RESPONSIVE DOCUMENTS.

The City and its Counsel have made nothing but a token effort to search for and to produce responsive paper and electronic documents—an inexcusable violation of their duties under the Federal Rules of Civil Procedure.

A.    The City and Its Counsel Owe A Duty to Conduct a Reasonable Search
      Competently, Diligently, and Ethically.

Under Federal Rule 34, a party and its counsel are obligated "to conduct a reasonable search for responsive documents." *FTC v. Affiliate Strategies, Inc.*, No. 09-4104, 2011 U.S. Dist. LEXIS 7689, at *11 (D. Kan. Jan. 26, 2011).  This duty must be exercised by parties, their employees, and their counsel "competently, diligently, and ethically." *Cardenas v. Dorel Juvenile Group, Inc.*, No. 04-2478, 2006 U.S. Dist. LEXIS 37465, at *23 (D. Kan. June 1, 2006); *see also Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 630 (D. Colo. 2007) (describing counsel's "obligations to coordinate and oversee discovery" and "responsibility to take appropriate measures to ensure that the client has provided all available information and documents which are responsive to discovery requests").

"Parties cannot fail to produce highly relevant documents within their possession with impunity.  Parties cannot be permitted to jeopardize the integrity of the discovery process by engaging in halfhearted and ineffective efforts to identify and product relevant documents." *Cardenas*, 2006 U.S. Dist. LEXIS 37465, at *22 (quotation omitted).  "A party cannot meet its discovery obligations by sticking its head in the sand and refusing to look for the answers and then saying it does not know the answer." *Affiliate Strategies*, 2011 U.S. Dist. LEXIS 7689, at *12 n.22) (quotation omitted); *see also Cache La Poudre*, 244 F.R.D. at 626 ("[O]nce a proper discovery request has been seasonably propounded, we will not allow a party sentiently to avoid its obligations by failing to examine records within its control" (quotation and alteration omitted).).

This duty to identify and to locate potentially relevant information "is heightened in this age of electronic discovery." *Richard Green (Fine Paintings) v. McClendon*, 262 F.R.D. 284, 290 (S.D.N.Y. 2009).  Trial counsel has the "affirmative duty to search for sources of electronic

18

information" and "must take responsibility for ensuring that their clients conduct a comprehensive and appropriate document search" in the clients' electronic documents, records, and e-mail. *Id.* (quotation omitted). This requires counsel to take at least three steps: (1) "to identi[fy] the persons having responsibility for the matters that are the subject of the document requests"; (2) "to identify all employees likely to have been authors, recipients or custodians of documents falling with the request"; and (3) "to review all documents received from the client to see whether they indicate the existence of other documents not previously retrieved or produced." *Cardenas*, 2006 U.S. Dist. LEXIS 37465, at *23. It is not enough for parties and their counsel to "mak[e] disjointed searches, each time coming up with a few more documents, and each time representing that was all they had." *Richard Green*, 262 F.R.D. at 290 (quotation omitted).

For example, this Court previously has found that a defendant's "failure to review [the] computer [of the main decision-maker in an employment-related case] for relevant documents before responding to plaintiff's production requests is inexcusable." *Jacobson v. Starbucks Coffee Co.*, No. 05-1338, 2006 U.S. Dist. LEXIS 98174, at *5 (D. Kan. Oct. 31, 2006). It is "[e]qually troubling" when a party never asks its managers and supervisors to search for documents responsive to requests for production and those managers and supervisors never "search[] their home office or work office" for responsive documents. *Id.* at *6.

Keyword-searches cannot be the sole means of meeting ones discovery obligations. Where a party maintains "large repositories" of ESI, keyword-searches might sometimes be an appropriate vehicle to "winnow relevant documents" for further manual review. *William A. Gross Constr'n Assocs. Inc. v. Am. Mfg. Mutual Ins. Co.*, 256 F.R.D. 134, 136 (S.D.N.Y. 2009) (quotation omitted); *see also* Sedona Conference Working Group, The Sedona Conference®

Best Practices Commentary on the Use of Search & Information Retrieval Methods in E-Discovery, 8 Sedona Conf. J. 189, 196 (2007) (explaining "the selective use of keyword searches can be a reasonable approach when dealing with large amounts of electronic data" (quotation omitted)).  The use of keywords is appropriate "[p]articularly . . . in large and complex litigation, where discovery is expected to encompass hundreds of thousands to hundreds of millions of potentially responsive electronic records."  Sedona Conference, 8 Sedona Conf. J. at 208.  But "simple keyword searching alone is inadequate" to locate potentially responsive documents, *id.* at 201, and, even where such searches are reasonable, they are "not intended to be mutually exclusive with manual review." *Id.* at 209.  Commentators and courts alike warn that keyword searches have significant limitations due to language usage, misspellings, and technical errors. *E.g.*, *id* at 201-202 (describing the limitations of keyword searches); *Gross Construction*, 256 F.R.D. at 135-26 (same); *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 259-60 (D. Md. 2008) (describing the "well-known limitations and risks associated" with keyword searches).  "Common sense dictates that sampling and other quality assurance techniques must be employed [in conjunction with keyword searches] to meet requirements of completeness." *Id.* (quotation omitted).

B.      <u>The City and Its Counsel Violated Their Duty to Conduct a Reasonable Search.</u>

Notwithstanding the requirements of the Federal Rules, neither the City nor its counsel have ever undertaken a comprehensive search for responsive documents, and the token searches it has conducted fall woefully short of their discovery obligations.  Sure, where Robinson has identified specific paper documents in the City's possession (such as personnel files for specific employees), the City generally has located and produced those documents.  But it is not Robinson's responsibility to specifically identify each document the City is to produce; it is the City's duty to search all of its records for responsive documents. *See Richard Green*, 262 F.R.D.

20

at 290 ("Under the federal rules, the burden does not fall on plaintiff to learn whether, how and where defendant keeps relevant documents" (quotation omitted).).   However, outside of the documents Robinson specifically identified, the City has produced practically nothing, having failed (1) to identify, to preserve, and to gather all repositories of potentially responsive information and (2) to conduct a reasonable search.

> 1.    *The City failed to identify, preserve, and gather all sources of potentially responsive documents and ESI.*

The City partially complied with its discovery obligations by preserving certain ESI and by collecting paper files from McFarland's office.  But it never satisfied its duty to determine whether all potential—or even likely—repositories of responsive documents had been collected. *See Cardenas*, 2006 U.S. Dist. LEXIS 37465, at *23 (describing duty to identify sources of responsive documents).  For example, the City preserved the ESI on Baugher's external storage device (containing, among other things, the August 26, 2008, backup of his laptop), his pre-February 2009 laptop, his post-February 2009 laptop, and the electronic files and e-mail stored on the City's network by Baugher, Archer, McFarland, and Russell.  But the City made no effort to determine whether it had gathered all of the electronic repositories with potentially responsive information.  It failed, for example, to preserve or to collect any ESI for some key custodians— such as other City "foremen," to whom the City compared Robinson (Tapia and Jacobs) or Mary Bartlett, the City's Public Service Secretary for many years.  It also failed to gather the locally-stored ESI—the documents or e-mail messages saved to a local hard drive (as opposed to a network location)—for any custodian other than Baugher.  The City merely preserved the electronic sources that its IT specialist independently concluded (without any further investigation) might contain information relevant to this litigation and gathered the paper documents kept by only one witness—the City's HR manager McFarland.  The City never

considered what additional electronic or paper sources might contain documents responsive to Robinson's requests for production—requests that City employees had never seen.   This is inexcusable discovery misconduct.

    2.  *The City never conducted a reasonable, comprehensive search of the ESI it collected.*

  The City identifies two specific searches it made and alludes generally to a third set of narrow searches on the ESI it collected.   These limited searches, however, do not even come close to satisfying the City's duty to locate responsive documents.

  The City's first search, conducted by Digital Mountain on March 30-31, 2011, is wholly inadequate to satisfy the City's and its counsel's obligation to locate responsive ESI for five reasons.   First, Digital Mountain searched only the documents provided it by the City—three of Baugher's electronic storage devices.   The City did not provide Digital Mountain with all of its ESI, or even all of Baugher's ESI (such as his post-February 2009 laptop or his network-stored .pst and user files), because the City had sent these repositories of ESI to its counsel, Kutak Rock, instead.

  Second, the searches took place before Robinson ever served any requests for production, so there is no way they could have been designed to locate all responsive documents.   To the contrary, the stated and sole purpose of these searches was to locate copies of two specific types of documents: foreman job descriptions and Robinson's performance reviews; all other documents potentially responsive to Robinson's requests for production were ignored.

  Third, because of the search's limited purpose, it ignored much of Baugher's ESI that was in Digital Mountain's possession.   For example, no search was done of his e-mail messages or other non-Microsoft Word or non-PDF files, such as Excel files, digital calendar entries, text files, or any other potentially responsive document.   And, at Kutak Rock's direction, the search

also excluded non-searchable PDF files because the City refused to pay the nominal cost of $1 per file (to a maximum possible charge of $856) to make those files searchable.  *See Semsroth v. City of Wichita*, 239 F.R.D. 630 (D. Kan. 2006) (concluding that costs of $3,374.95 to render ESI accessible, in addition to costs already expended to locate and to produce responsive documents, were reasonable).  Digital Mountain's search was also overly restricted to only those documents created or revised in 2007 or 2008.

Fourth, there is no indication that keyword searches are appropriate means for identifying responsive documents from Baugher's laptop.  This is not a complex case involving thousands or millions of potentially responsive documents.  Nor does it involve an inordinate number of potential ESI custodians whose files must be searched.  This is a simple, one-plaintiff lawsuit involving one small department in one local Kansas community.  Given the inherent limitations of keyword searches and the relatively small universe of potentially responsive documents, the use of a keyword search to identify potentially responsive documents—at the exclusion of a manual search process—is not justifiable.

Fifth, even if some sort of keyword search could have been appropriate, the search employed by Digital Mountain—if it even could be considered a search for responsive documents—was flawed and lacked any safeguards to ensure completeness.[8]  A search consisting of two remarkably narrow keywords is far too discriminating to produce an accurate set of potentially responsive documents.  Keywords should be used to "winnow relevant documents from large repositories" for a subsequent manual review; they should not be so specific as to exclude nearly every possible responsive document.  Robinson has identified documents that the City admits would have been on Baugher's storage devices at Digital

_____

[8] As a search crafted only to identify other versions or copies of two specifically-identified documents, it was perfectly reasonable.

Mountain, that are responsive to Robinson's requests, but that the City never produced.  And Digital Mountain's own report highlights that testing with other keywords identified many other likely responsive documents.  If the City were to reasonably employ keywords to identify responsive documents, it could have started at least with the most obvious searches:  "Trence" or "Robinson" or "Trence Robinson" or "Trence L. Robinson" or "Sanitation Forman."  But the City employed none of these terms, or countless others that likely would have uncovered responsive documents.

The City's second search, conducted by Digital Mountain on May 17, 2011, (and once again limited to a subset of Baugher electronic storage devices), occurred after the City had already responded to Robinson's requests for production and the same day that Robinson's counsel questioned the City's counsel regarding the paucity of documents produced.  But, like the March 2011 search, the May 17 search cannot be considered a search for all documents responsive to Robinson's request because it also targeted only the original word documents that corresponded to specific paper documents that the City identified for Digital Mountain (in this case, the job descriptions and performance evaluation documents the City presented during the December 2008 mediation).

Digital Mountain never conducted any other searches of Baugher's electronic storage devices that were in its possession.  Thus, no comprehensive search was ever performed to locate potentially responsive documents—not in March, not in May, and not at any other time.  As in *Jacobson*, the City's failure here to search all of the files of Robinson's direct supervisor and one of the key decision-makers in this case is inexcusable.

The only other ESI search that the City suggests has ever been done in this case was conducted by Kutak Rock on Baugher's post-February 2009 laptop and certain network files and

network e-mail, which the City provided to Kutak Rock in approximately April 2011.  While it was the City's understanding that Kutak Rock had conducted some sort of search on these repositories of ESI, that Kutak Rock had identified responsive documents from within those respositories, and that it would produce them to Robinson at some point, the City could only guess as to what searches Kutak Rock actually performed or when—if ever—the City, through its counsel, intended to produce the responsive documents located in those searches.[9]  And Kutak Rock has refused steadfastly to describe what steps it took to locate documents or when any documents it had found might be produced.

While the City and its counsel failed or refused to disclose to Robinson the efforts they have taken to locate and to produce responsive ESI from the data the City sent to its counsel, Robinson can divine from the lack of documents produced that no measurable effort has been made at all.  Despite having various custodian's network e-mail files and Baugher's post-February 2009 laptop in its possession, a review of all documents produced by the City in this case suggests that it has produced only a small smattering of e-mail messages—and only from the custodians' inboxes.  And there is no reason to believe that any of the network files for those custodians or the files on Baugher's post-February 2009 laptop—again, all in Kutak Rock's possession—have ever been produced in this case.  Because of the City's lack of knowledge and Kutak Rock's refusal to share its knowledge, Robinson can only speculate that either Kutak Rock (1) never conducted the searches it had lead the City to believe would occur, (2) conducted such unreasonably narrow searches, such as those it directed Digital Mountain to perform, that it resulted in the identification of no responsive documents; or (3) conducted reasonable searches, but deliberately withheld the responsive documents from production.  Whatever the reason, one

---

[9] As evidenced by the subsequent absence of any document production, the apparent answer to this latter question is "Never," at least absent an appropriate order from this Court.

thing is clear from the paucity of documents produced:   the City and Kutak Rock failed abysmally to satisfy their duties to locate and to produce all responsive documents.

Most troubling, this conduct is not an aberration.[10]   The City's misconduct already has stretched document production well past the Court's initial July 15, 2011, cutoff for all discovery and, with time necessary for the parties to fully brief and for the Court to rule on this Motion, it will continue to drag on towards the already-extended October 17, 2011, deadline for dispositive motions.

C.    To Remedy the City's and Its Counsel's Failures to Locate and to Produce All Responsive Documents, the Court Should Order the City to Investigate Whether Additional Paper Documents Exist and Should Order the City to Produce a Forensic Image of the Relevant ESI for Robinson's Inspection.

There is no more time in this case for discovery gamesmanship.   The most practical, efficient, and (in light of the City's conduct to date) just remedy for the City's and its Counsel's failure to locate and to produce responsive documents is for the Court to compel the City:

(1)    to investigate whether there are any repositories of paper documents (such as files kept by individual custodians) that should have been reviewed for production but were never collected by the City;

(2)    to produce all ESI the City has provided to its agents for review and production (Baugher's pre-2009 laptop and other electronic storage devices originally sent to

---

[10] The City has gone out of its way throughout this litigation to withhold key ESI.  The City initially misled the City's Mediation Committee into believing, through an impermissible and false *ex parte* communication, that responsive (but damaging to the City) ESI was accessible only at exorbitant costs.  [*See* Doc. 96, at 9-10.]  Then the City refused to locate or to produce documents in this case, dumping the blame at the feet of Digital Mountain.  But the City's counsel then subverted Robinson's attempt to obtain the responsive information from Digital Mountain when, after Robinson requested the information, Kutak Rock demanded that Digital Mountain return everything it had received from the City.  [*See* Doc. 96, at 21-22.]  At every turn, the City has delayed or frustrated Robinson's legitimate efforts to conduct discovery in this dispute.

Digital Mountain, but later returned to Kutak Rock; Baugher's post-2009 laptop; network files and e-mail for Baugher, Archer, McFarland, and Russell; and any other ESI the City has collected but failed to disclose to Robinson); and

(3)     to locate and to review for production the ESI it should have gathered and reviewed, including the network files and e-mail for Douglas Russell, Steve Archer, Tony Tapia, Randy Jacobs, and Mary Bartlett and the local hard drives (including files and local .PST e-mail files) for all custodians.

The production of a forensic copy (or direct inspection of the original electronic storage device) has become a rather ordinary sanction for a party's failure to reasonably search and produce responsive ESI. In *Jacobson*, as in this case, the defendant failed to search the main decision-maker's computer for responsive documents, and it was obvious to the plaintiff (and the court) that the defendant's production was incomplete in many respects. So that "plaintiff can determine whether production from [the decision-maker's] computer is complete," the court ordered the production of the computer itself or a mirror image of it. *Jacobson*, 2006 U.S. Dist. LEXIS 98174, at *20. In language that would apply with equal force in this case, it explained,

> Because of the failure to timely review [the decision-maker's] computer and other questionable discovery responses, plaintiff moves for production of [the decision-maker's] computer or a mirror image for review. . . . Although production of a computer for inspections is [or at least was at the time] unusual, the court is persuaded that the circumstances in this case warrant production of [the decision-maker's] computer or a mirror image of the hard drive for plaintiff's inspection. The record before the court reflects a history of incomplete and inconsistent responses to plaintiff's production requests. Unquestionably, the computer contains relevant information which defendant initially did not timely review for documents. Defendants belated search using four terms and its offer to conduct additional searches is simply "too little, too late."

*Id.* at *21-22.

As another District of Kansas decision explains, "It is not unusual for a court to enter an order requiring the mirror imaging of the hard drives of any computers that contain documents

27

responsive to an opposing party's request for production of documents." *Balboa Threadworks, Inc. v. Stucky*, No. 05-1157, 2006 U.S. Dist. LEXIS 29265, at *7 (D. Kan. Mar. 24, 2006).  In that case, the court "order[ed] that all of Defendants' computers and peripheral equipment, such as ZIP Drives, shall be made available for mirror imaging . . . ." *Id.* at 12.  Numerous courts in other jurisdictions similarly have ordered the production of computers or forensic images of electronic storage devices, particularly where (as here) there are "troubling discrepancies with respect to defendant's document production." *E.g.*, *Simon Property Group L.P. v. MySimon, Inc.*, 194 F.R.D. 639, 641 (S.D. Ind. 2000) (granting plaintiff's request for mirror images of computer hard drives, to be created by special expert appointed by court); *Hoover v. Fla. Hydro, Inc.*, No. 07-1100, 2008 U.S. Dist. LEXIS 87839 (E.D. La. Oct. 1, 2008) (refusing to quash subpoena for inspection of hard drives which were relevant to determining party's compliance with discovery obligations); *Comm'ns Ctr, Inc. v. Hewitt*, No. 03-1968, 2005 U.S. Dist. LEXIS 10891 (E.D. Cal. Apr. 5, 2005) (recounting that court had ordered production of mirror images of computer drives and sanctioning party for providing files that were not mirror images); *Fox Indus., Inc. v. Gurovich*, No. 03-5166, 2004 U.S. Dist. LEXIS 16778 (E.D.N.Y. Aug. 25, 2004) (adopting magistrate judge's recommendation to appoint a forensic computer expert to make a mirror image of defendant's computer).

This Court likewise should order the City to produce a forensic copy of the ESI requested by Robinson, either by appointing a special master to conduct the forensic imaging or by permitting Robinson to select his own expert to make the mirror image.

## II.    THE CITY'S BOILERPLATE OBJECTIONS TO ROBINSON'S SPECIFIC REQUESTS FOR PRODUCTION ARE MERITLESS, AND THE CITY PRESENTS NO BASIS FOR WITHOLDING THE REQUESTED DOCUMENTS.

In addition to the City's general failure to locate and to produce responsive documents, it asserted a litany of rote, boilerplate objections, none of which justify its subsequent refusal to

produce responsive documents in this case.  To the extent the City has withheld or intends to withhold any documents based on these objections, the Court should overrule the City's objections and compel the production of all responsive documents.

      A.      <u>The City's Boilerplate Objections Are Meritless.</u>

In response to Robinson's requests for production, the City regurgitated a number of conclusory, boilerplate objections, "to the extent" they apply.  Such statements do not adequately state an objection. *E.g.*, *Allianz Ins. Co. v. Surface Specialties, Inc.*, No. 03-2470, 2005 WL 44534, at *2 (D. Kan. Jan. 7, 2005) ("The familiar litany of general objections, including overly broad, burdensome, or oppressive will not alone constitute a successful objection . . . ."); *Sonnino v. Univ. of Kan. Hosp. Auth.*, 221 F.R.D. 661, 670 (D. Kan. 2004) ("This court looks with disfavor on conclusory or boilerplate objections that discovery requests are irrelevant, immaterial, unduly burdensome, or overly broad" (quotation omitted).).  And objections stated only "to the extent" they apply—without giving any indication to what extent they are being asserted—are "worthless for anything beyond delay of the discovery" and are "tantamount to asserting no objection at all."  *Sonnino*, F.R.D. at 666-67 (further describing such "ostensible" objections as "mere hypothetical or contingent possibilities where the objecting party makes no meaningful effort to show the application of any such theoretical objection to any request for discovery") (quotations omitted).

As one example of the City's rote recitation of a boilerplate objection, the City asserts the following objection in response to all but one (Request No. 10) of Robinson's requests:

> Defendant objects to the request to the extent it seeks information of which the probative value is outweighed by the time and expense burden on the Defendant if such discovery is allowed.  Defendant would show that to prepare a response to this request would require searching through numerous files.  In the event the Court orders the Defendant to comply with this request, Defendant will request the Court to hold an evidentiary hearing on the request and require Plaintiff to

post a good and sufficient security to pay for all costs and expenses in compliance
with this request.

[Supp. Responses, Ex. I.]

This boilerplate objection, asserted "to the extent" it applies, is meaningless under *Allianz*
and *Sonnino*. In addition, although emblematic of the City's approach to discovery in this case,
this objection has no substantive basis.[11] For example, the City objects that responding to each
of Robinson's requests for production "would require searching through numerous files." While
that might be true, it is not a valid objection—it is the cost of litigation. "The mere fact that
compliance with an inspection order will cause great labor and expense or even considerable
hardship and possibility of injury to the business of the party from whom discovery is sought
does not of itself require denial of [a motion to compel]." *Snowden v. Connaught Labs., Inc.*,
137 F.R.D. 325, 332-33 (D. Kan. 1991); *Capetta v. GC Servs. Ltd. P'ship*, No. 3:08-288, 2008
U.S. Dist. LEXIS 103902, at *10 (E.D. Va. Dec. 24, 2008) (quotation omitted) ("The mere fact
that responding to a discovery request will require the objecting party to expend considerable
time, effort and expense consulting, reviewing and analyzing huge volumes of documents and
information is an insufficient basis to object to a relevant discovery request."). This "court will
also not allow defendants to side-step their obligations to provide responsive documents simply
because these other documents exist in another department or because defendants believe
locating these documents within their own company is too burdensome." *Payless*, 2008 U.S.
Dist. LEXIS 28878, at *45.

There is likewise no basis for the City's request that Robinson post security to pay for the
City's discovery costs. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978)

---

[11] It is clear, for example, that the City's approach throughout discovery has been to <u>not</u>
undertake any efforts whatsoever that would require it to search through any files.

(explaining, under the federal discovery rules, "the presumption is that the responding party must bear the expense of complying with discovery requests").  Robinson does not seek ESI from sources that are "not reasonably accessible [such as an obsolete computer backup] because of undue burden or cost," which could trigger the Federal Rules' cost-shifting analysis.  *See* Fed. R. Civ. P. 26(b)(2) (authorizing cost-shifting for discovery of ESI from sources not reasonably accessible).  In fact, the ESI at issue here is readily accessible, as demonstrated by the fact that it largely has been identified, gathered, and delivered to the City's counsel."[12]

---

[12] Not only can the City not show that the ESI Robinson seeks is "not readily accessible," every factor the court considers in a cost-shifting setting weighs against the City in this case:

> While the general rule is that a party should bear the costs of producing discovery, the Court may consider numerous factors to determine whether to shift that cost to the requesting party, including whether the information is stored in an accessible or inaccessible format, and factors including (1) the specificity of the discovery request, (2) the quantity of information available from other and more easily accessed sources, (3) the failure to produce relevant information that seems likely to have existed, (4) the likelihood of finding relevant, responsive information that cannot be obtained from other, more easily accessed sources, (5) predictions as to the importance and usefulness of the further information, (6) the importance of issues at stake in the litigation and (7) the parties' resources. Fed. R. Civ. P. 26(b)(2), advisory committee's notes (2006); *see also Semsroth v. City of Wichita*, 239 F.R.D. 630 (D. Kan. 2006).

*Hudson*, 2011 U.S. Dist. LEXIS 39993, at *3-4.

In this case: (1) the eleven discovery requests at issue seek specific discovery on topics related to this litigation, as described in the text, below; (2) the ESI Robinson is seeking in this motion is not available from any other source, as most of the documents do not exist (or at least have not been produced by the City) in other formats and, in many instances, the metadata associated with an electronic document (available only from the documents if produced in native format) is important evidence in this case; (3) as demonstrated in the text, above, there is a strong likelihood—if not a certainty—of the City's failure to produce responsive documents that likely exist in electronic format; (4) those responsive documents likely are directly relevant to Robinson's claims that he was never properly compensated following his promotion  and work as the Sanitation Foreman; (6) such documents will be of particular importance and usefulness in making Robinson's claim that he was not compensated appropriately; and (7) the City has far greater resources to absorb these costs than Robinson, an individual employee in the City's Sanitation Department.  Thus, each of these factors weighs in favor of the general rule that the City must bear its own costs for responding to discovery.

It is highly unlikely that the cost to review the requested ESI in this case could be so extreme as to prove an undue burden.[13]   *See Semsroth*, 239 F.R.D. at 634 (noting "the burden of establishing that the information is not reasonably accessible because of undue burden or cost is on the party responding to the discovery request" and holding that the costs in that case did not justify cost-shifting); *Hudson v. AIH Receivable Mgmt. Servs.*, No. 10-2287, 2011 U.S. Dist. LEXIS 39993, at *2-6 (D. Kan. Apr. 13, 2011) (refusing to shift costs for electronic discovery). After all, the City has already incurred nearly all of whatever cost might have been associated with identifying and collecting the appropriate electronic sources, because those sources have already been gathered and provided to the City's outside counsel.[14]   In addition, "the cost of reviewing and producing electronic data once it has been converted to an accessible form" should always fall on the responding party and "is not subject to cost-shifting." *Semsroth*, 239 F.R.D. at 637 n.12.   In any event, the Court need not even consider whatever supposed burden the search for responsive ESI might place on the City, because Robinson's request to conduct its own examination of a mirror image of the City's ESI alleviates any possible burden on the City. *See id.* at 359 ("[I]n some instances, the expense involved may be so insubstantial as not to warrant the effort required to calculate it and shift it to the [propounding party]," such as "the expense [to the responding party] of producing their files for inspection").

_____

[13] Of course, given the City's previous misrepresentations, Robinson rightfully would be skeptical of any degree of burden the City might allege.  After all, the City previously alleged and communicated to a mediation panel member that it would cost $10,000 to extract the metadata related to a handful of key (albeit altered) documents it presented to the City Mediation Committee in December 2008, when the document properties (such as date created and last modified date) were accessible with a few mouse clicks.  Although the invoices were not disclosed, it is also highly unlikely that Digital Mountain, who ultimately located and exported the relevant documents and metadata, charged anywhere near $10,000 for its March 31, 2011, and May 17, 2011, searches for these documents.

[14] With the exception of the ESI for Tapia, Jacobs, Bartlett, or other relevant custodians, or the custodians' locally-saved ESI.

The City also asserted a second set of boilerplate objections in response to nine of the eleven requests (all but Request Nos. 1 and 10).  The City mindlessly "objects to the extent the request is overly broad, non specific [sic] and constitutes a 'fishing expedition' in its reference to 'any and all documents and things.'"[15]  [Supp. Responses, Ex. I.]  This objection—restated verbatim nine times—is nothing more than the rote recitation of a boilerplate, ostensible objection.  Such objections have no meaning and, in any event, as explained below, they are meritless.

> B.   Robinson's Requests are Reasonable, and the City's Remaining Objections Are Meritless.

Each of Robinson's requests is reasonable and the Court should overrule the City's meritless objections.

Request No. 1 seeks only documents related to Robinson's employment with the City since January 1, 2006.  The responsive documents are highly probative to Robinson's claims, which arise out of his employment, and should be relatively easy to locate, as they typically would include some reference to Robinson by name.  The request is reasonable and does not create an undue burden.  In fact, the scope of this request is similar to (and even narrower than) Request No. 10 (all documents discussing Robinson since January 1, 2006), to which the City did not object on any basis.

Request No. 2 seeks a narrow category of specifically-identified documents: communications between the City and the Mediation Committee members related to its hearings and decision on Robinson's grievance.  This request is highly probative of Robinson's claims regarding the City's misconduct during his grievance procedure  and it is narrowly tailored to the

---

[15] The objections are consistent, except in response to Request No. 8, where the City replaced its "fishing expedition" objection with an "unduly burdensome" objection.

33

communications that relate only to the Committee's review and decision regarding his grievance. The request is not overly broad, non-specific, or a fishing expedition.

Request No. 3, like Requests Nos. 1 and 10, seeks only documents related to Robinson and his employment with the City.  The request is narrowly tailored to documents related to Robinson's employment since January 1, 2006, and the responsive documents are highly probative of Robinson's claims regarding his employment with the City and should be easy to identify.  The request is not overly broad, non-specific, or a fishing expedition.

Request No. 4 is a specific request for the City's employment policies and procedures that would have been in place during the period of Robinson's employment.  The City contends it "could not have and did not promote" Robinson because of its policies and procedures, [*see* Proposed Pretrial Order, p. 10, attached as Ex. K], and the discovery sought is relevant to the terms and conditions of Robinson's employment—as written and as practiced.  Because the request seeks relevant documents, it is appropriate, even though it covers Robinson's entire period of employment.  *See Linnebur v. United Tel. Ass'n, Inc.*, No. 10-1379, 2011 WL 3490022, at *6 (D. Kan. Aug. 10, 2011) (requiring production of documents from plaintiff's entire thirty-four year employment history); *see also C.T. v. Liberal School Dist.*, No. 06-2093, 2008 WL 394217 (D. Kan. Feb. 11, 2008) (allowing discovery for an 18 year period, from 1990-2008). The request is not overly broad, non-specific, or a fishing expedition.

Request No. 5, like Request No. 4, is a specific request for documents reflecting the City's organization structure during the period of Robinson's employment.  This request is appropriate because it is relevant to the City's contention that the Sanitation Foreman job does not and never did exist.  [*See* Proposed Pretrial Order, p. 10, attached as Ex. K.]  The request is not overly broad, non-specific, or a fishing expedition.

Request No. 6 is a specific request for witness statements that relate to the issues in this case.[16]   Because the Request is limited to documents that relate to the issues in this case, the request is not overly broad.  Nor is this request unduly burdensome, as the City and its agents (such as its counsel) are likely to know immediately what witnesses statements are in their possession.  The request is not overly broad, non-specific, or a fishing expedition.

In addition to whatever other documents the City possesses or controls (but has yet to make any attempt to locate and to produce), Robinson has requested explicitly the production of deposition transcripts from certain key witnesses in this case who also testified in another pending employment-related case the City is defending in this Court.  While the City's counsel initially refused to produce these transcripts on the grounds that disclosure might violate a protective order in that litigation, it agreed to check with its opposing counsel, David Alegria.  After the City's counsel falsely represented that it had unsuccessfully tried to contact Alegria, Robinson's counsel contacted Alegria, who indicated that the City's counsel had never approached him about producing the transcripts and that he had no objection to their production.  Yet, nearly five months now since Robinson served this Request, the City is still withholding these transcripts.

Request No. 7 is a specific request narrowly tailored to Baugher's .pst files (*i.e.*, e-mail files) since January 1, 2006, that relate to Robinson's employment.  As Robinson's supervisor and the main decision-maker regarding Robinson's promotions and pay, Baugher's e-mail communications are highly probative of contested issues central to this case.  At least one such document—not produced by City—shows that the Baugher referred to Robinson in his e-mail as

---

[16]   The parties also dispute whether the City is improperly withholding responsive documents on the grounds of attorney-client privilege and attorney work-product.  That dispute is subject to a separate motion to compel. [Doc. 98.]

"Sanitation Foreman," directly contradicting the City's contentions that it never promoted Robinson.  [*See* Doc. 96, at 4.]  Robinson believes that there may be more communications of this type.  And, the City is required to search for them.  Yet, the City still has the gall to claim this request seeks irrelevant information.  The request is relevant, not overly broad, non-specific, or a fishing expedition.

Request No. 8 is a specific request narrowly tailored to job descriptions and performance evaluations since January 1, 2006, for Robinson and two other City employees.  Such documents—particularly in native format—are highly relevant to the issue of Robinson's promotion and the City's alteration of documents to mislead the Mediation Committee.  The City's objection that this request is "non-specific in regards to temporal time and scope related to individuals similarly situated as the Plaintiff" ignores the Request's express limitations as to temporal scope and its identification of the three employees covered.  Robinson also disputes City's mischaracterization that he "attempts to redefine commonly used word in its request as such reference to 'tendered.'"  "To tender" means "to present for acceptance" or to "offer freely," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED 2355 (1966); *see also* Tender, Dictionary.com, *last visited* August 29, 2011 (defining "to tender" as "to present formally for acceptance; make formal offer of" or "to offer or proffer"), precisely the usage employed by Robinson in this request.  The request is not vague or confusing, overly broad, non-specific, or a fishing expedition.

In addition, Robinson has the right to specify the form in which responsive ESI is to be produced.  Fed. R. Civ. P. 34(b)(1)(C).  Request No. 8 specifies that responsive electronic files

be produced in native format.[17]  While some responsive documents might exist in paper files, other responsive documents exist (and are kept in the usual course of business) as electronic documents.  In fact, the City admitted during the parties' May 17 conference call that one document it produced was a printout from an electronic file.  The Federal Rules do not permit Robinson to ignore the form of production Robinson requested for these electronic files and simply produce them in some "reasonably usable form."  *See* Fed. R. Civ. P. 34(b)(2)(E)(ii) (allowing producing party to select form only "[i]f a request does not specify a form for producing electronically stored information").

Except through the City's own incompetence in production, there is no risk of spoliation by production in native format, because Robinson would not have in its possession the original native file, only a forensic copy of it.  And the commentary to the Sedona Principles, selectively excerpted by the City, clearly explains that, while PDF production is acceptable and appropriate in some circumstances, native production is more appropriate in other circumstances.  Native-format production, "which generally includes the entire file and associated metadata, may afford the requesting party access to the same information and functionality available to the producing party and, from a technical perspective, usually requires minimal processing before production," making it *less* burdensome to produce. Sedona Conference, The Sedona Principles: Second Edition, Comment 12.b (June 2007), *available at* http://www.thesedonaconference.org/content/miscFiles/TSC_PRINCP_2nd_ed_607.pdf.  The examples illustrating this principle explicitly recommend native production of documents, with metadata, where, as here, authenticity of a document is disputed.  *Id.* at Comment 12.b, Illustration ii.  Because authenticity of the documents identified in this request is disputed, native

---

[17] Robinson does not contend, as the City appears to object, that it may not produce its hard copy files in .PDF format.

production is not only appropriate, but essential, because production as a PDF image eliminates "searchable text and metadata that might enable better understanding and utility of the evidence." *Id.* at Comment 12.b.

Request No. 9 is a tailored request limited to documents related to three specific job positions within the City. Despite claiming during the December 2008 Mediation Hearing that one of these positions—Robinson's Sanitation Foreman position—did not and could not exist and despite using documents related to the remaining two positions to support that claim, the City now incredulously contends that documents related to these positions are not relevant. The request is relevant and not overly broad, non-specific, or a fishing expedition.

The City has never objected to Request No. 10, so it must produce all responsive documents. But the City clearly has failed to fully respond to this request, which seeks all documents created or revised since January 1, 2006, that discuss Robinson. The City's Rule 30(b)(6) designee testified that certain e-mail communications that discuss Robinson should have been in the ESI it provided to its counsel for review and production, but he could not explain why they had not been produced. The failure to produce them violates the City's duty to produce responsive documents.

Request No. 11 specifically requests the documents that support the City's defenses. Despite that fact that any document that supports the City's defenses must be disclosed pursuant to Rule 26 and necessarily must relate to issues in this case, the City objects that this request calls for irrelevant information and is overly broad. Robinson's request is narrowly tailored to documents that necessarily are relevant, and its request is relevant and not overly broad, non-specific, or a fishing expedition.

38

Because the City and its Counsel violated their duties to locate and to produce responsive paper documents and ESI, and because the City's objections to Robinson's requests are meritless, the Court must grant Robinson's motion to compel and award him appropriate monetary sanctions.

## III.   THE CITY EFFECTIVELY FAILED TO APPEAR AT ITS RULE 30(b)(6) DEPOSITION.

Related to the City's failure to locate and to produce responsive documents is its failure to produce a knowledgeable Rule 30(b)(6) representative to testify as to the City's discovery process in this case.  The City's failure in this regard further underscores the extent to which the City will go to hide information from Robinson and, alone, constitutes sanctionable conduct.

A.   <u>The City and Its Counsel Were Obligated to Present a Knowledgeable City Representative to Testify as to the City's Efforts to Locate and To Produce Responsive Documents.</u>

Robinson served an amended Rule 30(b)(6) notice of intent to depose the City, identifying certain topics to be covered.  This notice triggered obligations under the Federal Rules for the City and its counsel to prepare a knowledgeable representative to speak to noticed topics on the City's behalf.

Under the Federal Rules of Civil Procedure, a party may name any entity as a deponent, identifying the "matters for examination."  Fed. R. Civ. P. 30(b)(6).  The named entity may designate any person (or persons) it chooses to testify on its behalf, and that person "must testify about information known or reasonably available to the organization."  *Id.*  This Rule was intended to "curb the bandying" by which each officer or agent of a company disclaims any personal knowledge of information that is known to someone in the organization.  *Starlight Int'l, Inc. v. Herlihy*, 186 F.R.D. 626, 638 (D. Kan. 1999) (quotation omitted).  Rule 30(b)(6) depositions are only effective when the entity "designate[s] and adequately prepare[s]

witnesses," who are thus "informed" as to the topics identified in the deposition notice.   *Id.* (quotations omitted).

An entity and its designee may not take this duty to prepare lightly.  To the contrary, the entity "must not only produce such number of persons as will satisfy the request, but more importantly, prepare them so that they may give complete, knowledgeable and binding answers on behalf of the [entity]."  *Id.* (quotation omitted).  For example, the designee must "review all matters know or reasonably available to it . . . to prevent the 'sandbagging' of an opponent by conducting a half-hearted inquiry before the deposition but a thorough and vigorous one before the trial."  *Id.* (quotation omitted).  *Id.*  The entity's efforts to prepare its designee(s) must be "conscientious" and in "good faith."  *Id.* at 639.  This sometimes "burdensome" obligation is "merely the result of the concomitant obligation from the privilege of being able to use the corporate or other organizational form in order to conduct business."  *Id.* at 638 (quotation omitted); *see also Sprint Communications Co, L.P. v. TheGlobe.com, Inc.*, 236 F.R.D. 524, 528 (D. Kan. 2006) (explaining the "onerous" burden is justified because an entity "can only act through its employees").

A party has not satisfied its duty to prepare a knowledgeable designee when the designee "stat[es] it has no knowledge or position with respect to a set of facts of area of inquiry within [the entity's] knowledge or reasonably available [to it]."  *Starlight*, 186 F.R.D. at 638 (quotation omitted).   A Rule 30(b)(6) designee's testimony that another employee or agent of the designating entity would be able to answer a particular question "clearly indicates that [the entity] had available other persons who could have been used as additional Rule 30(b)(6) witnesses" or to help prepare the designee.  *Heartland Surgical Specialty Hosp., LLC v. Mid-West Div., Inc.*, No. 05-2164, 2007 U.S. Dist. LEXIS 26552, at *25 (D. Kan. Apr. 9, 2007).  And

while the designee need not disclose privileged or work-product protected information, "the attorney-client privilege does not protect facts," *Sprint*, 236 F.R.D. at 529 (citing *Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981)), and the designee must "provide responsive underlying factual information even though such information was transmitted through or from corporate lawyers." *Id.*.  When a designated deponent cannot answer questions within the scope of the deposition notice, "the corporation has failed to comply with its Rule 30(b)(6) obligations and may be subject to sanctions" under Rule 37(d) because "[p]roducing an unprepared witness is tantamount to a failure to appear at a deposition." *Starlight*, 186 F.R.D. at 638-39. (quotations omitted).

> B.   <u>The City's Rule 30(b)(6) Designee Was Entirely Unprepared to Answer Any Questions Beyond His Limited Personal Knowledge Regarding the City's Efforts to Locate and to Produce Responsive Documents, which is Tantamount to a Failure to Appear.</u>

The City and its counsel failed to prepare a knowledgeable Rule 30(b)(6) witness to testify as to the City's discovery efforts.  The City was required to designate a representative to testify, among other things, as to:

> Efforts made to locate and produce documents responsive to Plaintiff's First Request for Production of Documents to Defendant served April 11, 2011, including, but not limited to, efforts made to locate and produce electronically stored information under Defendant's possession, custody, or control, including specifically, efforts made to locate responsive ESI created or modified by Gary Baugher after July 1, 2007.

[Doc. 29, at 2].

Metzinger, the City's Rule 30(b)(6) designee, understood the scope of this topic, and he understood his obligation to speak on behalf of the City beyond his personal knowledge. [Metzinger Depo 9:23-10:2; 45:5-46:5; 116:20-117:1, attached as Ex. H.]  But the City made very little effort to prepare Metzinger.  Metzinger met with the City attorney, Tamara Niles, and attorneys from the City's outside counsel, Kutak Rock, and he spoke generally with David Dang,

41

a Digital Mountain employee about the searches Digital Mountain conducted, but he never made any inquiries of other City employees or agents who he knew possessed information regarding Topic 1.  [*See id.* at 14:22-15:9; 17:24-18:7; 116:10-19.]

Because of his personal involvement, as the City's IT employee, in the preservation and collection of certain ESI, Metzinger generally was able to testify as to the City's preservation of Baugher's pre-February 2009 laptop and related storage devices, his post-February 2009 laptop, and the network .pst and user files for Baugher, Archer, McFarland, and Russell.

But, despite being the City's designated representative, Metzinger was unable to speak to issues outside of his personal knowledge.  Particularly with respect to the City's efforts to locate and to produce responsive documents, Metzinger was largely unable to answer any of Robinson's questions.  What seems most egregious is the fact that Metzinger had never even seen Robinson's First Request for Documents or the City's response.  [*Id.* at 24:11-18.]  No city employee ever performed any searches on any other ESI the City sent to Digital Mountain or provided to its counsel, and Metzinger could not answer Robinson's questions about the ESI on Baugher's pre-February 2009 laptop [*id.* at 36:17-21; 38:8-24; 44:11-18; 54:12-15] or the other ESI the city collected [*id.* at 68:5-8; 106:23-107:15].  Nor could he answer technical questions regarding the City's abilities to conduct its own keyword searches.  [*Id.* at 108:23-109:10.]

Whenever he was asked, personally or as the City's representative, about the content of any of these repositories (including the existence of specific electronic communications that should have been preserved in the City's data, but which had not been produced to Robinson) or the search methods or keywords used by Digital Mountain or the City, Metzinger always disclaimed any knowledge and directed Robinson's counsel to knowledgeable City employees, such as Marla McFarland, the City's HR manager, or Steve Archer, the former City Manager [*id.*

at 47:1-5; 68:9-25; 115:21-116:19; 132:24-134:3], or other City agents, such as the City's experts at Digital Mountain or its attorneys at Kutak Rock [*id.* at 44:11-18; 54:12-25; 67:18-68:25; 106:23 - 107:15; 108:11-22; 120:18-22; 121:9-15; 143:12-21; 145:5-23; 148:4-21].   The fact that other City employees and agents would have known the answers establishes that the information Robinson sought was within the knowledge of the City and, therefore, within the scope of information Metzinger was obligated to learn prior to appearing on the City's behalf at the Rule 30(b)(6) deposition.

Compounding the problems arising from his lack of knowledge, Metzinger refused to testify as to some information that he did know because Galdean improperly instructed that facts related to the City's discovery efforts—as carried out by Kutak Rock—were privileged.  Galdean likewise refused to answer Robinson's questions regarding the City's production.   But Robinson's questions related to facts regarding the City's efforts to locate and to produce responsive documents and are not privileged, and the City may not withhold those facts merely because they were within the knowledge of or had been communicated by the City's counsel. *Upjohn*, 449 U.S. at 395-96 (holding that facts are not subject to attorney-client privilege and may not be withheld merely because they had once been stated in a privileged communication); *Sprint*, 236 F.R.D. at 529 (same, in Rule 30(b)(6) deposition context).

The City's failure to prepare a Rule 30(b)(6) witness to testify as to the City's discovery efforts—a topic identified in Robinson's notice—is a failure to appear and is sanctionable. *Cherrington Asia Ltd. v. A&L Underground, Inc.*, 263 F.R.D. 653, 660 (D. Kan. 2010)

(sanctioning a party for failing to adequately prepare its Rule 3(b)(6) designee to answer questions regarding the party's efforts to respond to discovery).[18]

## III.   TO REMEDY AND DETER THE CITY'S DISCOVERY VIOLATIONS, THE CITY MUST BE SANCTIONED.

The Court must use its powers to reign in the City and its repeated, abusive discovery practices.   Such an award is appropriate under Rule 26, Rule 37, and the Court's inherent powers.   Under Rule 26(g), an attorney of record must certify that each discovery response or objection is consistent with the Federal Rules, not asserted for an improper purpose, and is not unreasonable. Fed. R. Civ. P. 26(g)(1). "[T]he consistent failure of defendant and its counsel to conduct reasonable factual inquiries . . ., where the omitted documents and information should have disclosed" violates Rule 26(g).  *Cache La Poudre*, 244 F.R.D. at 636.  Absent substantial justification, an award of expenses under Rule 26(g)(3) "is mandatory," and does "not require a finding of bad faith." *Id.* (quotation omitted).

Sanctions are also appropriate in this case under Rule 37.   An award of expenses is mandatory under Rule 37(a)(5)(1) for a party prevailing on its motion to compel (unless the opposing party's conduct is "substantially justified" or an award of expenses is "unjust").  Fed. R. Civ. P. 37(a)(5)(1); *A. Farber & Partners, Inc. v Garber*, 234 F.R.D. 186, 194 (C.D. Cal.

---

[18] Calvin Weeks' subsequent export report and deposition testimony do not cure the City's Rule 30(b)(6) violations.  The City did not designate Weeks as a Rule 30(b)(6) designee and his testimony does not have the same binding effect on the City as Rule 30(b)(6) testimony. *See Heartland Surgical*, 2007 U.S. Dist. LEXIS 26552, at *27 (rejecting party's argument that subsequent depositions of the party's CFO and IT Director as fact witnesses, which were "not the same as a Rule 30(b)(6) deposition which presents the testimony of the corporation itself rather than just the personal knowledge of the witness," could defeat a request for sanctions against it for failing to prepare a Rule 30(b)(6) designee).   And, in any event, Weeks, who did not personally perform the searches identified in his expert report, had only limited knowledge related to the devices that had been in Digital Mountain's possession and the two narrow searches Digital Mountain conducted.   And he had no involvement with and offered no testimony as to the City's efforts to locate and to produce responsive information from any other source, such as the ESI in Kutak Rock's possession.

2006) (awarding attorney's fees against party that violated its duty to search for and to produce responsive documents).  And Rule 37(d) authorizes the Court to sanction a party for failing to appear at its deposition, and failing to prepare a Rule 30(b)(6) designee to knowledgeably answer questions within the scope of the deposition notice is "tantamount to a failure to appear at a deposition." *Starlight*, 186 F.R.D. at 638-39. (quotation omitted).

The Court also may exercise its inherent powers to sanction a party by awarding attorneys' fees.  *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) (upholding court's use of inherent powers to order sanction of attorneys' fees).  Such sanctions are appropriate where a party fails to reasonably search electronic records for responsive documents. *Richard Green*, 262 F.R.D. at 288 (explaining that "a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs," and that such "[s]anctions may be imposed on an attorney, a party, or both"(quotations omitted)).

In this case, the City and its Counsel have engaged in sanctionable conduct.  They failed to gather all potentially responsive documents and have never engaged in any thorough or comprehensive search of the repositories they did collect.  The only specific searches the City has identified were designed to locate the electronic versions of certain specific paper documents the City had previously produced; no general search for responsive documents was ever conducted.  The City did not even bother to conduct a full search of the ESI it collected from Baugher, Robinson's direct supervisor and one of the key players in this case, an "inexcusable" failure for which monetary sanctions are appropriate.  *Jacobson*, 2006 U.S. Dist. LEXIS 98174, at *5, 22-23.

The City and its counsel compounded their discovery violations by failing to present a prepared witness to testify as to the City's discovery efforts and counsel's improper instructions

that Metzinger not answer factual questions regarding those efforts.  These violations constitute a failure to appear, which is sanctionable.

There is no substantial justification for the City's repeated and blatant violations of its discovery obligations in this case.  And there are no circumstances which made an award of expenses unjust.  Therefore, the Court must award Robinson reasonable expenses, including attorneys' fees, related to Robinson's efforts to compel the production of responsive documents (including filing this motion) and expenses related to its Rule 30(b)(6) deposition.

## CONCLUSION

For more than 2.5 years, the City has stalled, delayed, obfuscated, and blocked Robinson from obtaining key documents—particularly ESI—related to his claims against the City.  The time now has arrived for the Court to end the City's discovery gamesmanship and to compel the City to produce all responsive documents, as described above, and to award Robinson his reasonable expenses, including attorneys' fees.

Respectfully submitted,

FOULSTON SIEFKIN LLP

By /s/ Charles E. McClellan
    C. Edward Watson, II, #23386
    Todd N. Tedesco, #15652
    Charles E. McClellan, #23692
    1551 N. Waterfront Parkway, Suite 100
    Wichita, KS 67206-4466
    Telephone: 316.267.6371
    Facsimile: 316.267.6345
    cewatson@foulston.com
    ttedesco@foulston.com
    cmcclellan@foulston.com

    ATTORNEYS FOR PLAINTIFF

## FEDERAL RULE 37(a)(1) CERTIFICATION

I hereby certify, pursuant to Federal Rule of Civil Procedure 37(a)(1), that Robinson's counsel conferred in good faith regarding this discovery dispute prior to filing this motion.  As explained above, the parties engaged in multiple efforts, in writing, by telephone, and by taking depositions related to the City's efforts to locate and to produce responsive documents in an effort to resolve these disputes before Robinson filed the instant Motion to Compel.

*/s/ Charles E. McClellan*
Charles E. McClellan, #23692

## CERTIFICATE OF SERVICE

I hereby certify that on September 8 2011, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

Alan L. Rupe E-mail: alan.rupe@kutakrock.com
Trinidad P. Galdean E-mail: trinidad.galdean@kutakrock.com
Jessica L. Garner E-mail: jessica.garner@kutakrock.com
Kutak Rock LLP
1605 N. Waterfront Parkway, Ste. 150
Wichita, KS 67206

*/s/ Charles E. McClellan*
Charles E. McClellan, #23692