## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **TRENCE ROBINSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **vs.** | ) | **Case No. 10-1431-JAR** |
| | ) | |
| **CITY OF ARKANSAS CITY,** | ) | |
| **KANSAS,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Plaintiff Trence Robinson alleges that his employer, The City of Arkansas City, Kansas

("the City"), promoted him to a supervisory position in September 2007.  He alleges that, despite

assuming clearly supervisory duties and responsibilities, and despite being told that he would be

classified and paid as a "Sanitation Foreman," the City declined to classify and pay him in

accordance with the new position.  The City's decision was initially made by Robinson's

Department Head; it was ratified by the City Manager.  After a hearing, a three-person

Mediation Committee determined that Robinson had not been promoted but awarded him a

nominal raise to reflect his increased job responsibilities.  Robinson asserts claims against the

City for race discrimination under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §

1981, and for due process violations associated with the Mediation Committee's decision under

42 U.S.C. § 1983.  He alleges a state law claim under the Kansas Wage Payment Act ("KWPA").

Before the Court is Defendant's Motion for Summary Judgment (Doc. 143) on all claims.

The motion is fully briefed and the Court is prepared to rule.  As described more fully below, the

motion is granted in part and denied in part.  The motion is granted on the municipal liability

claim under 42 U.S.C. § 1981 because there is no genuine issue of material fact as to whether the City's actions constitute a "custom or policy."  But the Court finds that there is a genuine issue of material fact about whether Robinson was promoted and therefore was denied the classification and pay he was due in conjunction with that promotion.  This genuine issue of material fact precludes summary judgment on the discrimination claim because Plaintiff could show that the City's proffered reason for failing to classify and pay him—that he was not promoted—is unworthy of credence.  And it precludes summary judgment on the due process claims because if Plaintiff was promoted, he has a protected property interest in the appropriate classification and pay associated with his promotion.  The KWPA claim turns on whether Plaintiff was denied wages he was due, so summary judgment is precluded on this claim as well.

## I.        Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[1]  In applying this standard, courts view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[3]  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[4]

---

[1]Fed. R. Civ. P. 56(a).

[2]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

[3]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[4]*Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[5]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[6]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[7]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[8]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[10]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[11]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by

---

[5]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[6]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671).

[7]*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[8]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[9]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

[10]*Adams*, 233 F.3d at 1246.

[11]Fed. R. Civ. P. 56(c)(4).

specific facts, or speculation.[12]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[13]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[14]

## II.    Background

The City's reply memorandum fails to adhere to D. Kan. Rule 56.1(c): "[t]he moving party must respond to the non-moving party's statement of additional material facts in the manner prescribed in subsection (b)(1)."  The responding party is to identify each fact that is in dispute and "refer with particularity to those portions of the record upon which the opposing party relies, and, if applicable, state the number of [non]movant's fact that is disputed."[15]  When a party fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the motion.[16]  Here, The City specifically controverts only four of Robinson's 172 statements of additional fact set forth in the response memorandum.  The Court considers the facts to which the City does not respond as uncontroverted for purposes of this motion.

---

[12]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[13]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[14]*Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

[15]*See also* Fed. R. Civ. P. 56(c)(1).

[16]Fed. R. Civ. P. 56(e)(2).

The following facts are either uncontroverted, stipulated, or viewed in the light most favorable to Robinson as the nonmoving party.

***The City Handbook***

Arkansas City is a municipality of the State of Kansas that operates under an elected five-member Commission-Manager form of government.  In February 1988, the City Commission passed a resolution adopting the City of Arkansas City Personnel Policy Handbook ("the Handbook"),[17] which sets forth various "policies, rules and regulations" that were to be "administered by the City Manager" and only could be changed "by an act of the City Commission."  The Handbook's "purpose . . . is to inform employees of the personnel rules and regulations governing the City organization including the privileges and benefits afforded employees, the expectations the City has for its employees, and the general policies and procedures for addressing common personnel matters," and "to provide information about personnel policies, rules and regulations."  All City employees were given their own copy of the Handbook and were expected to follow the procedures set forth in it.

The Handbook provides:

> The authority for all personnel actions, including hiring, promotion, discipline and dismissal lies with the City Manager. The Manager may delegate such authority and responsibility as he may deem appropriate.  Appointment of any person to a position in the service of the City shall be initiated by completion of a Personnel Action Form by the Department Head requesting the appointment.  The appointment will become official when it is approved by the City Manager and returned to the department head.

The Handbook refers separately to "appointments" and "promotions" in several sections.

---

[17]Doc. 152-1, Ex. A at A00291.

When a Personnel Action Form ("PAF") is required, individual employees have no responsibility or role in filling it out and no duty under the City's personnel policies to complete it, or to ensure that it is completed.  Instead, it is the department head's responsibility to ensure that the proper paperwork is filled out.

In conjunction with the annual budget process, the City Commission annually adopts a Pay Ordinance, which is described in the Handbook as follows:

> The City Manager is responsible for recommending to the City Commission a uniform and equitable pay plan. Such plan shall annually be a part of the recommended budget. It will consist of minimum and maximum rates of pay and such intermediate pay steps as are necessary to provide reasonable and consistent advancement through the pay range as merited by job performance and experience. The pay plan shall reflect an equitable relationship among the job classifications and shall be made after review of . . . [the] responsibilities of the position, and the policies of the City.
> The City Commission shall formally adopt a pay plan ordinance, which . . . shall establish minimum and maximum rate[s] of pay for each class.  All employees are to be paid within this range . . . .

The Pay Ordinance is also referred to as the Classification Plan, which, according to the Handbook, "provides an inventory of all positions in the City service which are sufficiently alike in duties and responsibilities to be called by the same job title, to be accorded the same pay scale and to require substantially the same qualifications on the part of the incumbents."

Employees in different positions within the same job classification "ought to be performing similar types of duties and responsibilities, should be receiving approximately the same pay scale, and should possess substantially the same qualifications as one another." Further, an employee may not be "classified in a classification or paid at a salary rate which is not established and recognized in the City's classification and pay plans."  "When an employee

is promoted to a position in a higher classification, the employee's salary will be increased to at least the minimum rate for the higher classification."  An employee may be considered for a merit increase within his or her pay grade annually at mid-year, which shall only be granted by approval of the City Manager and on the recommendation of the Department Head.

The Handbook requires the City to "prepare and maintain a job description for each classification," which must include "suggested training and experience" requirements and any "special requirements" for that classification. The job description for a classification is not specific to a particular position within a specific division, but rather describes the job classification's requirements generally.

The City Manager or his delegate may fill positions within the job classifications on the Pay Ordinance without City Commission approval.  A person promoted to a permanent position with the City must complete a probationary or qualifying period of at least six continuous months.  At the end of that period, the City conducts a performance evaluation; otherwise, an employee is only evaluated annually in May or June of each year.

City employees have the right to present a complaint or grievance concerning employment decisions, and the City's Mediation Committee, empaneled to hear these grievances, has the authority to make "binding and final" decisions that include issues regarding an employee's "job, working conditions, [and] salary."

*City Structure and Robinson's Employment*

The City is organized into several departments that report to the City Manager, including a Public Services Department and a Buildings and Grounds Department.  Jim Miller began serving as the Public Services Superintendent in 1990.  When Miller began, the Public Services

7

Department included a Streets Division and a Sanitation Division.  At that time, Randy Jacobs held the position of Streets Foreman, was classified as a Labor Foreman, and reported directly to Miller.  Don Cook held the position of Sanitation Foreman and, like Jacobs, was classified as a Labor Foreman and reported directly to Miller.  Miller eventually took on the additional role of Buildings and Grounds Superintendent, but Cook continued to be classified and compensated in the Labor Foreman classification, and he continued to report directly to Miller.

After Cook retired in the early 1990s, Miller added the role of Sanitation Foreman to his own duties, instead of immediately filling the position with another person.  Miller used Dave Nichols—a Maintenance Worker III-classified employee in the Sanitation Division—as "a work leader" who "direct[ed] people in the workplace as they go out to work."  Miller did not believe Nichols was "the type of person to be a foreman," so Miller did not put him "in charge of management" of the Sanitation Division.[18]  During his tenure, Miller recruited and hired three employees to groom for foremen positions, including Tony Tapia (who first became foreman in the Parks Division and now serves as the Buildings and Grounds Superintendent) and Robinson (who Miller believed could become the Sanitation Foreman one day).

Robinson is an African-American male.  He began working in the City's Public Service Department in 1994 primarily in the Sanitation Division and his position was classified as a Maintenance Worker I.  Miller was Robinson's direct supervisor and was responsible for conducting his employee evaluations.  After he obtained his commercial driver's license, Robinson was qualified to drive the sanitation trucks and thereafter was promoted to a Maintenance Worker II-classified position in 1996.

---

[18]Doc. 154-4, Ex. R at 170:1–8, 176:1–6.

8

Following Miller's retirement in 2001, the City hired Gary Baugher to serve as Superintendent of both the Public Services Department and the Buildings and Grounds Department.  Baugher continued to use Nichols, who is Caucasian, to supervise work crews and assigned him some additional supervisory duties, such as filling out employee evaluation forms and signing written disciplinary warnings.  But notwithstanding these duties, Baugher apparently did not consider Nichols to be the Sanitation Foreman; according to the performance evaluations that Baugher completed for Nichols in 2004 and 2005, Baugher identified Nichols' position as the "Assistant Sanitation Foreman"—a position that does not exist on the Pay Ordinance.  And Nichols signed at least one disciplinary report as "Foreman" during this time.

Baugher, with approval from the City Manager, promoted Robinson to Maintenance Worker III on December 17, 2004.  Robinson learned of the promotion when Baugher told him about it.  In 2004, the  Maintenance Worker III job description included the following: "works under the immediate supervision of the labor foreman," exercises "[n]one to slight" supervision over other employees, and performs, as requested, other duties that are "similar, related or a logical assignment to the position."[19]

### Fall 2007 Change in Duties

In 2007, Nichols was dealing with some personal issues and by July 2007, Baugher asked Robinson to help Nichols with his duties "for a time," which Robinson did.  He continued to be classified as a Maintenance Worker III.  In the fall of 2007, Baugher told Robinson that he was being promoted to the role of Sanitation Foreman and pointed him to an organizational chart that showed him at the same level as current foremen Jacobs, Tapia, and a position Baugher intended

---

[19]Doc. 154-6, Ex. AA.

to fill in the Stormwater Division.

Baugher told his secretary, Mary Bartlett, that Nichols had declined his offer to take some additional classes that would allow him to perform the Sanitation Foreman position. Instead, Baugher told Bartlett that he decided to promoted Robinson to the Sanitation Foreman position. The City issued Robinson a new employee badge that identified him as a Sanitation Foreman. This promotion made him the first African-American supervisor employed by the City outside of the City's EEO office.

In 2007, there was no specific classification in the Classification Plan for "Sanitation Foreman," but there was a classification for "Labor Foreman." The Labor Foreman job description includes various supervision tasks, including supervising workers' conformance to appropriate safety and security standards. It includes as a "Desired Minimum Qualification" graduation from high school or GED equivalent. It is a Code 435 classification created in June 1994. In 2007 and 2008, this classification was in pay grade 35.

In October 2007, Baugher gave Robinson a new job description for the position of Sanitation Foreman.[20] He told Robinson that "this is your job description." It indicates a Job Code of 435 and a pay grade of 35. The date on the job description is September 2007. "Desired Minimum Qualifications" include "[a]n Associate's Degree in Environmental Technology or a related field." Robinson does not possess an associate's degree in environmental technology or any other field. This form is signed by Robinson and dated October 17, 2007. He returned it to Baugher and was provided a photocopy for his records.

Baugher gave this job description to Robinson as part of a broader "process of rewriting

---

[20]Doc. 154-2, Ex. H.

supervisor job descriptions to read the way that they should."[21]  During this time frame, Baugher

also revised and delivered job descriptions to Tapia and Jacobs for the positions they already

held.  The descriptions included specific job code and pay grade information.

No PAF was ever completed for Robinson's promotion and then City Manager Russell

never formally approved any personnel action promoting Robinson from the Maintenance

Worker III position.

Baugher met with Robinson on October 23, 2007, to discuss the pre-evaluation

Performance Enhancement Program Review form for Robinson's new position.  The purpose of

the pre-evaluation form was to lay out the specific duties and responsibilities that Baugher

expected Robinson to perform during the coming evaluation period.  The pre-evaluation form

Baugher prepared clearly identified Robinson's position as Sanitation Foreman.  At the end of

the meeting, Baugher and Robinson both signed the pre-evaluation form, acknowledging "that at

the end of the evaluation period [Robinson]'s going to be evaluated based on his performance in

the position of sanitation foreman."  Robinson signed as Sanitation Foreman.  Baugher

forwarded the signed pre-evaluation form to the City's human resources department, where it

was placed in Robinson's personnel file.

Robinson's pre-evaluation form, like the forms for Jacobs, Tapia, and the Sanitation

Division maintenance workers, identified five areas in which their performance would be judged.

Only Section A, "Responsibilities" was specific to each person's position.  The specific

Responsibilities in Section A, on which Robinson would be evaluated, all related to his duties as

a foreman, not to the duties of a maintenance worker.  Of the nine specific duties listed on

---

[21]Doc. 154-7, Ex. PP.

Robinson's form, eight are identical to criteria used to evaluate Tapia's performance and seven are identical to criteria used to evaluate Jacobs's performance.  By contrast, the Responsibilities stated on Nichols's evaluation form (as a MWIII-classified employee), largely relate to daily work duties in the field.  While Nichols's Responsibilities mirror those of the Maintenance Worker I and II employees, there is no overlap in any of the Responsibilities on Nichols's and Robinson's evaluation forms.

After Robinson signed the job description and pre-evaluation forms, his job responsibilities changed.  Robinson began supervising as many as eleven maintenance workers in the Sanitation Division, disciplining and evaluating maintenance workers, and working under the immediate supervision of Public Services Superintendent Baugher.  He also attended Baugher's weekly meeting of supervisors, where he was expected to report on the sanitation division. Baugher referred to Robinson as the supervisor of maintenance workers in the Sanitation Department.  And Baugher instructed Robinson to get some "schooling" on leadership and computers to help him perform his new duties.  Consequently, Robinson took numerous City-paid leadership and computer courses over the next six months.

Jacobs and Tapia both testified in their depositions that Robinson was performing the duties of a foreman in the Sanitation Division.  Indeed, according to Tapia and Jacobs, no MWIII employee in the Public Services Department had ever been given the degree of responsibility over employee discipline and evaluation, which are foremen-level job duties, that had been given to Robinson.

A Microsoft Publisher document kept by the City Manager's Executive Secretary Nancy Crain, and last modified on April 11, 2008, contains the graphics for name tags for City

uniforms, including name tags for "Randy [Jacobs]" as "Street Supervisor," "Trence [Robinson]" as "Sanitation Supervisor," and Tony [Tapia]" as "Park Supervisor."  But the uniform tags for other employees, such as "Dave [Nichols]," an MWIII-classified employee in the Sanitation Department [Ex. B, 6], and "Dennis [Unruh]," an MWIII-classified employee in the Streets Department [id.], do not identify their position or title.  Baugher's own Microsoft Outlook contact card for Robinson identifies his job title as "Sanitation Supervisor."

According to Archer, if Baugher "had not promoted [Robinson] to sanitation foreman, then there was no reason for him to refer to [Robinson] as sanitation foreman."  On February 8, 2008, Baugher sent an e-mail to Bob Frazee, Cowley County's emergency preparedness coordinator, with contact information for his four division supervisors, including Robinson, whom he identified as the City's Sanitation Foreman.

At some point prior to April 10, 2008, Robinson asked Baugher about his promotion and corresponding increase in compensation to Grade 35, but Baugher responded by threatening to discipline him for insubordination if he made any further inquiries.  On April 10, 2008, Baugher met with Robinson to discuss his performance for the six-month period ending March 2008. When Baugher drafted Robinson's six-month performance evaluation prior to their April 10 meeting, however, he changed Robinson's title on the document from Sanitation Foreman, as it had been on the pre-evaluation form, to "Sanitation Foreman (Maintenance III)."  He recommended that Robinson receive a $1 per hour raise to reflect the extra duties he had assumed over the previous year.  During the April 10 meeting, Robinson told Baugher he was upset about the job title change on the document, because he felt like Baugher "was coming up with a new job title from the one that he previously gave me" and "was trying to cover his

tracks."

On Baugher's recommendation and after City Manager Archer's approval, the City hired Chuck Blass, a Caucasian applicant, on July 14, 2008, as the "Assistant Storm Water Superintendent" with job code and pay grade "435-35-A."  In other words, "he was classified and paid at the level of a labor foreman" on the City's Pay Ordinance.  The advertised position and accompanying job description identified the job as "Labor Foreman/Assistant Superintendent Stormwater."  On other City documents, Blass's position is described as the Stormwater Foreman.  Neither "Assistant Storm Water Superintendent" nor "Stormwater Foreman" is listed on the 2008 Pay Ordinance or in the 2008 Annual Budget Document.  In fact, Marla McFarland acknowledged to Baugher in an October 2007 e-mail that the City's "old job descriptions" did not match the names on the Pay Ordinance and has admitted that there are city employees who hold positions not listed on he City's Pay Ordinance.  The City's 2006, 2008, and 2009 listings of Positions by Pay Grade each indicate an active Labor Foreman position in Pay Grade 35.

According to Jacobs and Tapia, Robinson exercised even "greater responsibility for supervising employees in the Sanitation Division" than Blass did in the Stormwater Division, where he supervised only one employee.

***The Grievance Procedure***

On May 15, 2008, Robinson's counsel sent a letter to the City, seeking back pay "at the rate that is due a Sanitation Foreman" and pay "at the rate due a Sanitation Foreman for all future pay periods."  The City insisted that Robinson exhaust the City's Grievance Procedure, which includes a discussion with the City Manager, Steven Archer, and submission of a complaint to

14

the Mediation Committee.  Robinson met with Archer on July 29, 2008, and on August 6, 2008,

Archer denied Robinson's appeal in writing on the ground that "no promotion took place"

because "[t]he City does not have a Sanitation Foreman position in our classification and pay

plan," and because an appointment to a position must be initiated by a PAF, which was never

filled out for Robinson's promotion.  Archer's position is and was that an employee cannot

expect to be paid for the actual work performed, if requested by his manager, unless the manager

actually fills out a PAF.

Robinson invoked the third and final step of the grievance process, a hearing by a neutral

Mediation Committee.  The mediation panel was comprised of Mark Paton, Judy Reedy, and

Charles Jennings.  Robinson was represented by counsel; both Robinson and the City presented

evidence.  Each party and the Committee members were given the opportunity to cross-examine

the witnesses.  During his opening statement to the Mediation Committee on December 8, 2008,

Robinson presented his signed copy of the Sanitation Foreman job description that Baugher gave

him in October 2007 as evidence that Baugher promoted him and was expecting him to perform

the duties of the position within the 435/35 Labor Foreman classification.  The City challenged

the authenticity of the job description Robinson had presented: "The document that Mr.

Robinson has presented . . . has never been—we don't know where that comes from.  But we do

know that that's not part of his personnel file."  The City proffered a competing version of the

Sanitation Foreman job description, which it claimed Baugher gave to Robinson.  The content of

the City's version of the job description is identical to Robinson's copy except that the City's

version omits the information about the specific job code and pay grade (i.e., 435/35) to which

the Sanitation Foreman position was assigned.  Instead, under "Position," it reads "Sanitation

Foreman (Maintenance III)."

The hearing was cut short and continued to December 30.  Prior to the December 30 hearing continuance, Jennings informed the City, "I think it will save the mediation committee some time if we can see the metadata validating the creation of the document brought into question by Mr. Galdean.  It appears a pivotal point in question about which documents are authentic."  Although the City agreed to produce the information related to this document, it claimed it could not do so before the December 30 continuation of the hearing allegedly because of the difficulty of "coordinating with various IT individuals" during the holidays, even though the City only staffs one IT position.  When the hearing resumed on December 30, 2008, the City again contended that its version of the job description, without the 435/35 job code and grade information, was the actual version Baugher gave to Robinson—thereby implying that Robinson must have added the information to his copy of the document.

While the City did not produce the metadata that would have resolved the authenticity of this document prior to the December 30 hearing, it apparently examined the document properties, because it asserted that "the creation date that's on the document when it was created" was between October 16-19, 2007.   The City claimed it was "able to get other information, which again supports that this was a draft job description."  This "other information" included the job descriptions of the "Labor Foreman/Assistant Superintendent Public Services" and "Labor Foreman/Assistant Superintendent Buildings and Grounds" positions, which the City represented had a "creation date" of October 16-19, 2007, and which the City offered to show that these job descriptions were drafts (they were red-lined) and that the job-description document Baugher in fact gave to Robinson did not have any job code or grade

information.  These versions of the other job descriptions lacked any reference to a specific job code or pay grade.  Based on the City's representations during the hearing, Jennings expanded his request to include the metadata for these additional job descriptions.

The City claimed it could not have promoted Robinson to the Sanitation Foreman position because no "Sanitation Foreman" classification had been budgeted in the Annual Budget Document or existed on the City's Pay Ordinance, and such a classification would have to be approved by the City Commissioners.  To support this claim, the City presented excerpts of the 2008 Budget Document to the Mediation Committee showing that no "Sanitation Foreman" position was listed for the Sanitation Division and pointed to the procedures allegedly used to create and fill the Assistant Stormwater Superintendent position that Blass filled.

Before the Mediation Committee rendered a decision, Archer had an *ex parte* telephone conversation with Paton in which Archer told Paton that it would cost "in the $10,000 range" to produce the metadata and that "the City was not willing to go to that expense for the mediation process."[22]  Paton "was totally unfamiliar with the metadata process,"[23] and he "had no reason not to believe Mr. Archer."[24]  Indeed, prior to the grievance hearing, Paton had never heard the term "metadata," and, even at the time of his deposition, did not "know how to view the metadata associated with a Microsoft Word document."[25]

On Monday, January 5, 2009, Archer sent two *ex parte* e-mail messages with attachments to Mediation Committee members Paton and Jennings and to the City's counsel related to the

---

[22]Doc. 154-7, Ex. YY at 43:22–25, 45:17–18.

[23]*Id.* at 55:24–25.

[24]*Id.* at 56:1–4.

[25]*Id.* at 41:8–11.

"substantive issues" in Robinson's grievance and "the meaning of the evidence that was offered to the [the Mediation Committee]." One of Archer's *ex parte* e-mails stated that the City hired Blass on July 14, 2008, into the 435/35 Job Classification. Archer attached the July 2007 cover letter from then-City Manager Russell to the City Commission discussing the funding of two new positions in the stormwater fund and summarizing the proposed 2008 budget, and the PAF for Blass's appointment as an Assistant Stormwater Superintendent.[26] Archer did not send Paton a copy of the 190-page budget document. The budget document specifies that the two new positions requested for the stormwater division were Maintenance Worker-classified positions. Likewise, the 2009 proposed budget requested two new employees in the stormwater division, both Maintenance Worker classified positions. These budget documents were not provided to the Mediation Committee.

The Mediation Committee issued its decision later in January 2009.[27] It determined based on the evidence presented that "there was a major breakdown in communication between Public Services Superintendent Gary Baugher and employee Trence Robinson." It concluded that Baugher did not have the authority to offer Robinson the Sanitation Foreman position, that the Sanitation Foreman position did not exist because the City Commission had not approved that job classification in the budgeting process, and that the City Manager did not approve the position, which was required. The Mediation Committee recommended that Baugher receive a reprimand for failing to communicate with his employee and that Robinson be awarded a pay increase of $.75 to $1.00 per hour from the date he accepted an increase in his job

---

[26] Doc. 154-8, Ex. HHH.

[27] Doc. 154-5, Ex. T.

responsibilities.  Committee member Jennings did not sign the decision.  The City implemented a retroactive merit increase of $1.00 per hour.

The 2009 Pay Ordinance does not include the position of Labor Foreman.  Instead, the 435/35 position is called Assistant Superintendent/Stormwater.  And the Maintenance Worker positions in the 2009 Pay Ordinance now specify their division—Street, Sanitation, Park/Cemetery.

After the Mediation Committee's decision, Robinson was told not to attend the supervisory meetings anymore and that he would be supervised by Jacobs.  Baugher directed Jacobs to discipline Robinson if he signed employee evaluations or other personnel forms as "Sanitation Foreman."  He was awarded a $1.00 per hour raise retroactive to September 2007, which was over $4000 less than the minimum annual wage rate stated in the City's Pay Ordinance for the Grade 35, Step D-classified position for Labor Foreman.

***Job Description Documents Submitted to Mediation Committee***

The City engaged a third party consulting company, Digital Mountain, to preserve the electronically-stored information on its electronic storage devices and conduct searches for responsive documents in this litigation.  Digital Mountain produced a metadata report for job description documents on electronically stored devices used by Baugher.  Through this production, the City disclosed five copies of the Sanitation Foreman job description that include the classification code and pay grade 435/35, identical to the document Robinson produced at the Mediation Committee hearing with the exception of Robinson's signature and ordinary distortions caused by photocopying.  Also, the City's copies contain several items under the "Job Duties and Responsibilities" section in red font.  These copies were last modified in October

2007.  The City also produced two copies of the job description that do not include the 435/35 job code and grade reference—one is a backup copy created in August 2008—but that are otherwise identical to the copies of the job description created in October 2007 that do include that reference.  The job description that does not include the job code and grade reference was "last accessed" and "last written" on April 11, 2008, the day after Robinson met with Baugher and asked why the job title on his performance evaluation had changed.

Digital Mountain also produced metadata for the Tapia and Jacobs job descriptions from 2007 and 2008.  It found multiple copies of these job descriptions.  Two copies of each included pay code and grade information and one copy of each is identical except that the pay code and grade information is not included.  Tapia's job description that lacks a job code and grade was modified on December 8, 2008 at 3:20 p.m., just after the first day of the Mediation Committee hearing concluded.  And Jacobs' job description without the job code and grade information was modified on December 8, 2008 at 3:21 p.m.

III.    Discussion

   A.    Race Discrimination under Title VII and Section 1981

Robinson claims that the City discriminated against him because of his race in violation of Title VII and section 1981 when it failed to classify and compensate him as a Labor Foreman after his promotion.  Robinson is correct that the City mischaracterizes his claim as failure to promote—Robinson's theory in this case is that he was not properly classified and paid for the work he performed in accordance with a promotion.

   Robinson has not come forward with direct evidence of race discrimination, so the Court evaluates his claims under the burden-shifting framework of *McDonnell Douglas Corp. v.*

*Green*.[28]  Under *McDonnell Douglas*, plaintiff initially bears the burden of production to establish a prima facie case of discrimination.[29]  To establish a prima facie case of race discrimination, Robinson must show that (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination.[30]  If plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a facially nondiscriminatory reason for its actions.[31]  If defendant articulates a legitimate nondiscriminatory reason, the burden shifts back to plaintiff to present evidence from which a jury might conclude that defendant's proffered reason is pretextual, that is, "unworthy of belief."[32]

### 1.      Prima Facie Case

The City argues that Robinson cannot establish a prima facie case of discrimination because he was not qualified for the Sanitation Foreman position since he lacked an Associate's degree in environmental technology or a related field and because he did not suffer an adverse employment action.

First, The City argues the Robinson was not qualified for the Sanitation Foreman job because it required an Associate's degree, which Robinson did not possess.  Robinson responds that this was not a requirement for the job, pointing out that the Associate's degree was listed

---

[28]411 U.S. 792, 802-05 (1973); *Orr v. City of Albuquerque*, 417 F.3d 1144, 1449 (10th Cir. 2005).

[29]*McDonnell Douglas*, 411 U.S. at 802.

[30]*EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 & n.5 (10th Cir. 2007) (discussing how elements of prima facie case in discrimination cases vary depending on context.)

[31]*Id.*; *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).

[32]*Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

only as a "desirable" minimum qualification and that the job description indicates that work experience can be a substitute for this requirement.  The Court finds that Robinson does not assert a traditional "failure to promote" claim in this case, so Robinson's qualification for the job is not necessarily a part of the prima facie case.[33]  Indeed, Robinson claims that he was promoted but not properly classified and paid.  Viewing the facts in the light most favorable to Robinson, he was promoted by Baugher in September 2007, so any failure to meet the desired minimum qualifications on the job description is a moot point as it did not inhibit his promotion.  The purpose of the prima facie case is to eliminate the most common nondiscriminatory reasons for the adverse employment action.[34]  While his lack of qualification would explain the City's failure to promote Robinson, it does not account for the adverse employment action alleged here—the failure to properly compensate and classify once promoted.[35]  Furthermore, Robinson alleges that this is one of the reasons the adverse employment decision is pretextual, an argument the Court addresses in the following section.[36]

The City also argues that Robinson has not alleged an adverse employment action because he received a pay raise for the additional responsibilities he undertook in 2007; he was not subjected to a significant change in benefits.  The Tenth Circuit construes "adverse employment action" liberally, taking a "case-by-case approach, examining the unique factors

---

[33]*See PVNF, L.L.C.*, 487 F.3d at 800 & n.5.

[34]*See, e.g.*, *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005).

[35]*See, e.g.*, *Klindt v. Honeywell Int'l, Inc.*, 303 F. Supp. 2d 1206, 1215 (D. Kan. 2004) (assuming that the plaintiff was qualified when she merited an interview in a traditional failure to promote case).

[36]*See EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1192–93 (10th Cir. 2000) (explaining that a defendant cannot defeat the plaintiff's prima facie case by offering the proffered reason for discharge).

relevant to the situation at hand."[37]  But generally an adverse employment action must

"constitute a significant change in employment status, such as hiring, firing, failing to promote,

reassignment with significantly different responsibilities, or a decision causing a significant

change in benefits."[38]  The Court finds that Robinson can establish an adverse employment

action here given the evidence that he was promoted but denied the classification and pay that

was due to him based on that promotion and on the additional job responsibilities that placed him

in a supervisory role.  Robinson sought a classification in pay grade 35, which would have

increased his pay significantly more than the $1.00 per hour raise that he received after the

Mediation Committee issued its final decision.  Moreover, in a discriminatory compensation

case, the Court is not to determine "whether plaintiff received *any* pay raise but whether he

received a lesser raise than similarly situated employees of different races."[39]  Keeping in mind

that Robinson's burden of establishing a prima facie case "is not onerous,"[40] the Court finds that

Robinson has met his burden and proceeds to consider whether the City's proffered reasons for

its actions are pretextual.

## 2.    Pretext

Having come forward with sufficient evidence of a prima facie case of race

discrimination, the City must articulate a legitimate nondiscriminatory reason for failing to

classify and compensate Robinson as a foreman.  The City explains that Robinson was not

---

[37]*EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1040 (10th Cir. 2011).

[38]*Id.* (quotation omitted).

[39]*Taher v. Wichita State Univ.*, 526 F. Supp. 2d 1203, 1218 (D. Kan. 2007) (citing *Amro v. Boeing Co.*, 232 F.3d 790, 798 (10th Cir. 2000).  As discussed more fully in the pretext analysis, Robinson does come forward with evidence that he was paid less than similarly situated employees with the same job responsibilities.

[40]*See, e.g.*, *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005).

qualified for the 435/35 labor foreman position, it never promoted Robinson because there is no job classification for Sanitation Foreman, and that the City Manager never approved the classification or promotion.  Therefore, the burden shifts back to Robinson to present evidence that these reasons are a pretext for race discrimination.

To show pretext, Robinson can present evidence that reveals "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'"[41]  "The plaintiff's evidence can also allow for an inference that the 'employer's proffered non-discriminatory reasons [were] either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).'"[42]  When assessing whether the plaintiff has made the appropriate showing under this standard, the Court must consider the evidence as a whole and draw all inferences in favor of the plaintiff.[43]

### a.    Same Actor Inference

The City argues that it should be entitled to the "same actor inference," an inference that no discriminatory animus motivated the employer's actions.[44]  The Tenth Circuit has announced that this inference applies where "the employee was hired and fired by the same person within a relatively short time span."[45]  The reasoning behind this inference is that "[i]t makes little sense to deduce" that the same individuals that hired the plaintiff, fully aware of the plaintiff's race,

---

[41]*Id.* at 1102 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

[42]*Id.* at 1102–03 (quoting *Fuentez v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

[43]*Danville v. Regional Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002).

[44]*Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006).

[45]*Id.* (quotation omitted).

terminated a plaintiff because of race.[46]  Even where the inference applies, the Plaintiff may still present countervailing evidence of pretext—the doctrine gives rise to an inference, not a presumption, that no discriminatory animus motivated the employer's decision.[47]

The City argues that Baugher was responsible for promoting Robinson from a Maintenance Worker II to a Maintenance Worker III classification in December 2004 and that Baugher is the one who allegedly promoted Robinson to Sanitation Foreman in the first place. The City argues that it makes no sense that Baugher would then rescind a promotion based on race when he had promoted Robinson in the past.  Robinson responds that the same actor inference does not apply in the context of discrimination in compensation or failure to promote cases.  Moreover, Robinson points to his own evidence of pretext as a rebuttal to any inference that may apply.

The Court agrees that the same actor inference carries little utility in a case such as this that alleges discriminatory classification and compensation.  In these cases, the issue is not whether the supervisor terminated an employee based on discriminatory animus, it is whether a benefit of the job was denied based on discriminatory animus.  Robinson argues here that he was granted a promotion and that he upheld his job responsibilities in line with that promotion, yet the City failed to compensate him for the work he performed.  The fact that Baugher had previously promoted Robinson from a Maintenance Worker II position to a Maintenance Worker III position, with little change to his job role, does not dispel the notion that he would fail to properly classify Robinson after requiring him to perform supervisory duties that bear little

---

[46]*Id.*

[47]*Id.*

resemblance to his Maintenance Worker III job role, allowing the City to gain a supervisor without paying him a supervisor's salary.

It is also notable that the City denies that Baugher was authorized to make personnel decisions without City Manager approval.  The City claims that Robinson had no reasonable expectation of a promotion and higher compensation without such approval, which is inconsistent with its claims that the same actor inference should apply here.  Given that there is a genuine issue of material fact about whether the City Manager must approve promotion decisions, it is hardly clear that the same actor actually made all of these personnel decisions here, a predicate to the Court's application of this inference.

Finally, even if the same actor inference applied in this case, the Court finds that it is rebutted by other evidence of pretext, as set forth below.

### b.   Robinson's Qualifications

The City first urges that it decided not to classify Robinson as a Labor Foreman at a level 35 pay grade because he did not have an Associate's degree, which was a minimum qualification for the position.  The City points to the Sanitation Foreman job description Baugher drafted that lists this degree as a "desired minimum qualification."  But, as already discussed under the prima facie case, because a reasonable jury could believe Robinson's evidence suggesting he was promoted, his qualification for the position is not at issue.  Moreover, the Court agrees with Robinson that this is a *post hoc* explanation for the City's decision.  It was not mentioned by Archer in denying Robinson's appeal of Baugher's decision and was not discussed in the Mediation Committee's decision denying Robinson's grievance.

Finally, a reasonable jury could find that the job description provided to Robinson and relied upon by the City for this minimum qualification shows that Robinson was minimally

qualified for the Sanitation Foreman position.[48]  Under "Education and Experience," the job description lists three requirements in the disjunctive:

> (A)     High School Diploma or Equivalent.  An Associate's
>          Degree in Environmental Technology or a related field.
> (B)     Minimum of five (5) years of experience relating to solid
>          waste utility and (2) years of super experience; or
> (C)     Any equivalent combination of education and experience.[49]

It is also undisputed that Robinson took several classes after his promotion to Sanitation Foreman at the City's expense and on Baugher's recommendation.  Indeed, the evidence suggests that Nichols was not promoted to the Sanitation Foreman position because he was unwilling to take these additional classes.  Viewing this evidence in the light most favorable to Robinson, his combination of education and experience sufficiently qualified him for the promotion, suggesting that this was not the true reason for the City's decision to not classify him as a labor foreman.

### c.      Sanitation Foreman Classification

The City argues that Robinson never received a promotion to the Sanitation Foreman classification because that classification does not exist—it was never created by the City Commission and incorporated into the Classification Plan. Because these steps were not taken, the City argues that Robinson was not promoted and thus could not have been improperly classified and compensated.  The City contends that it is merely Robinson's subjective belief that he was promoted.

Robinson argues that he was promoted and should have been classified as a Labor

---

[48]In 2007 and 2008, the Labor Foreman classification did not require an Associate's degree.

[49]Doc. 154-2, Ex. B.

Foreman, a classification that already existed in the 2006, 2008, and 2009 Pay Ordinances.  He argues that this justification for the City's adverse action is pretextual because it is undisputed that Robinson was actually performing work that qualified for pay grade 35 compensation.  The Court agrees that there is evidence upon which a reasonable jury could conclude that Robinson should have been classified as a Labor Foreman under the applicable Pay Ordinance.  The history of the department suggests that the title "Sanitation Foreman" had been used before—Don Cook held that position in the Sanitation department for several years before retiring in the early 1990s and was classified as a Labor Foreman, at which time Superintendent Jim Miller took on Cook's job duties rather than immediately filling the position.  Nichols, as a Maintenance Worker III, performed some of those duties for Miller, but Miller but did not assign him to a management role.  Robinson has come forward with evidence that Miller hired Robinson to groom him for the Sanitation Foreman job.

Also, there is evidence that the City's job titles did not always match the descriptions in the Pay Ordinance, and that it has hired at least one individual into a position that was not listed on the proposed budget presented to the City Commission.  Baugher identified Nichols as an "Assistant Sanitation Foreman," for a time, even though that job description did not exist in the Classification Plan and Pay Ordinance.  And in 2008,  Baugher hired Chuck Blass as an "Assistant Storm Water Superintendent," even though that position is not listed on the 2008 Pay Ordinance.  The Budget proposal sent to the City Commission for approval for 2008 and 2009 only requested funding for new Maintenance Worker level positions. McFarland, who worked in human resources, indicated to Baugher in 2007 that the names on the job descriptions did not match those on the Pay Ordinance.  Given this evidence, a reasonable jury could conclude that the City's proffered explanation that the Sanitation Foreman position must be approved by the

City Commission and listed on the Classification plan is not worthy of credence.

Robinson further argues that it was not merely his subjective belief that he was promoted, citing evidence that he was actually performing the job duties of a labor foreman and was treated as such by his superiors.  This evidence includes: (1) he was issued a new Sanitation Foreman badge and a Sanitation Supervisor uniform tag was prepared for him; (2) the job description that includes the 435/35 job code and supervisory responsibilities; (3) the pre-evaluation form setting forth the criteria upon which the Sanitation Foreman position would be evaluated; (4) he attended weekly supervisor meetings at Baugher's direction and answered directly to Baugher; (5) he evaluated and disciplined the maintenance workers in the Sanitation Division; (6) he was held accountable for the Sanitation Division employees' conduct; (7) the other foreman understood that Robinson had been promoted and that he was performing Sanitation Foreman duties; (8) Baugher identified him as the Sanitation Foreman when providing contacts for the Cowley County emergency preparedness coordinator; and (9) Robinson was given a six-month probationary period evaluation for the period of September 2007 through March 2008 corresponding to the period of time Robinson performed the increased job duties.[50]   The Court agrees that a reasonable jury could find that these facts call into question the City's proffered reason for failing to properly classify and pay Robinson that the Sanitation Foreman job was not listed on the Pay Ordinance and approved by the City Commission.

### c.    Authority to Promote

The City further argues that it failed to classify Robinson as a Labor Foreman because Baugher was not authorized to promote Robinson; the City Manager must approve the promotion

---

[50]It is also notable that after the Mediation Committee's decision Robinson was apparently reprimanded for performing many of these job duties.

and a PAF must be completed.

A genuine issue of material fact exists as to whether Baugher had been delegated authority to promote Robinson and whether the promotion was valid without a PAF. Viewing the evidence in the light most favorable to Robinson, the City Manager delegated his authority to Baugher to promote Robinson to the Sanitation Foreman position with a job code of 435 and pay grade of 35. Indeed, Baugher executed an affidavit on December 5, 2008 attesting that he has "the final say in who receives promotions and changes in pay grades." This evidence controverts Russell's deposition testimony that he did not delegate this authority.

Further, while there was no PAF completed for Robinson's promotion, the Handbook does not make clear that this form was required for promotions. It requires a PAF for all "appointments," but the Handbook distinguishes between "appointments" and "promotions" in several places yet only requires a PAF for appointments.[51] And the evidence is uncontroverted that the employee has no duty or responsibility for completing this form. Robinson reasonably relied on Baugher's assurances that he had been promoted and that the necessary paperwork would be completed. As such, a reasonable jury could conclude that these explanations for the City's conduct are unworthy of belief.

### d.  Similarly Situated Employees

In establishing pretext, Robinson also relies on the City's treatment of similarly situated employees to show that its stated reasons for failing to correctly classify and compensate him are a pretext for race discrimination. A plaintiff may show pretext by proving that similarly-situated

---

[51]*See* Doc. 152, Ex. A at A00289 (Equal Opportunity Policy), A00290 (Eligibility for Employment), A00292 (Probationary Policy).

non-protected individuals were treated more favorably after committing comparable conduct.[52]
"Similarly-situated employees are those who deal with the same supervisor and are subject to the
same standards governing performance evaluation and discipline."[53]  To determine whether
employees are similarly situated, the Court "should also compare the relevant employment
circumstances, such as work history and company policies, applicable to the plaintiff and the
intended comparable employees."[54]

Viewing the evidence in the light most favorable to Robinson, in 2007 and 2008, the City
employed four foreman-level employees under the direct supervision of the Baugher: a Labor
Foreman/Assistant Superintendent of Public Services (staffed by Jacobs in 2007); a Labor
Foreman/Assistant Superintendent Buildings & Grounds, Parks & Cemetery (staffed by Tapia in
2007); an Assistant Stormwater Superintendent or Stormwater Foreman (established in and
staffed by Blass beginning in July 2008); and the Sanitation Foreman position performed by
Robinson since the fall of 2007.  It is uncontroverted that these four men worked in the same
Department, and a reasonable jury could conclude that they reported to the same supervisor,
attended the same supervisor meetings, provided the same types of reports, and exercised the
same degree of supervision over their employees. In fact, the job descriptions for these positions
appear to derive from one common template and are identical, save for a few department-specific
daily duties. The expectations for performance in these positions, as laid out in the City's
performance evaluation forms, were likewise identical.  In fact, there is evidence that Robinson

---

[52]*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000).

[53]*Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 922–23 (10th Cir. 2004) (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997)) (internal quotation marks omitted).

[54]*McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006).

had greater job responsibilities than Blass because Blass supervised only one other employee. Each non-African-American employee (i.e., Tapia, Jacobs, and Blass) was classified and compensated properly (at Grade 35 or higher). But Robinson—the one African-American employee to ever hold a foreman position with the City—was not classified or compensated properly; he was still paid at Grade 30 as a Maintenance Worker III.

The City argues that other comparator evidence is more relevant—Nichols, who is Caucasian, performed many of the same duties as a Maintenance Worker III before Robinson took them over in July 2007. But the Court finds that a reasonable jury could reject Nichols as a similarly situated individual because there is evidence that Nichols was at best considered an "Assistant Foreman," that he had declined Baugher's promotion offer because he did not want to take the classes it required, and that Miller specifically hired three other individuals before his retirement in order to groom them for supervisory roles in the department—he did not have the same expectations for Nichols. Moreover, Robinson submits evidence that while Robinson did perform Nichols' job duties for a time between July and September 2007, in September 2007, Baugher approached Robinson with the promotion and Robinson's supervisory role increased.

### B.      Municipal Liability under Section 1981

Robinson asserts a claim against the City under 42 U.S.C. § 1981, alleging that it deprived Robinson of his right to make and enforce contracts and to enjoy the benefits of his employment because of his race. The City moves for summary judgment on this claim, arguing that the statute of limitations has expired and that there is no genuine issue of material fact about whether the City's officials acted pursuant to a discriminatory custom or policy. Despite

Robinson's characterization of his claim in the Pretrial Order as arising under § 1981,[55] the Court recognizes that "the explicit remedial provisions of § 1983 [are] controlling in the context of damages actions brought against state actors alleging violations of the rights declared in § 1981."[56]  The City urges that the claim should be construed as a claim under § 1983; Robinson concedes as much in the response, where he characterizes it as a discrimination claim under § 1983.  The Court construes the claim as one brought under § 1983.

### 1.      Statute of Limitations

The City argues that Robinson's § 1983 claim must have been filed within the statute of limitations provided for similar actions under Kansas law—two years.[57]  Robinson argues that the four-year federal "catch-all" statute of limitations applies because his claim is based on the 1991 amendment to § 1981 since it involves discriminatory compensation or classification.[58] While the Supreme Court held in *Jones v. Railroad Donnelley & Sons Co.* that the four-year statute of limitations applies to claims that allege violations of the amended version § 1981, it was not in the context of a § 1981 claim against a state actor, which under *Jett* may only be brought under § 1983.[59]  Since the Supreme Court's 2004 decision in *Jones*, federal courts have disagreed about whether claims under § 1981 against state actors are governed by the § 1983

---

[55]Doc. 138 at 16–17.

[56]*Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 731 (1989); *see Bolden v. City of Topeka, Kan.*, 441 F.3d 1129, 1137 (10th Cir. 2006) (holding that Congress did not overrule *Jett* when it amended § 1981 in 1991 and that damages claims against state actors for § 1981 violations must be brought under § 1983); *Brown v. Unified Sch. Dist. No. 501*, No. 10-1096-JTM, 2011 WL 2174948, at * (D. Kan. June 3, 2011).

[57]*See Brown v. Unified Sch. Dist. No. 501*, 465 F.3d 1184, 1188 (10th Cir. 2006) (holding two-year statute of limitations for personal injury actions in K.S.A. § 60-513(a) applies to civil rights claims under both 42 U.S.C. § 1981 and § 1983).

[58]28 U.S.C. § 1658 (providing a four-year statute of limitations for claims arising under an Act of Congress enacted after December 1, 1990).

[59]*Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383–84 (2004).

state law limitations period, or by the federal four-year statute of limitations in 28 U.S.C. § 1658.[60]

The Court will follow the only published court of appeals decision on this issue and apply the four-year statute of limitations.  In *Baker*, the Eleventh Circuit determined that even though § 1981 claims against state actors must be brought under § 1983, if the claim is "made possible" by the 1991 amendments to § 1981, it "arises under" a post-1990 enactment and the four-year statute of limitations applies.[61]  Here, the City does not contest that Robinson's claim for discrimination in compensation and classification was not cognizable under the pre-1991 version of § 1981.  "[C]laims under § 1981 relying upon discrimination in *contract formation*, which were actionable prior to the 1991 amendment, would be governed by residual state statutes of limitations . . . .   Claims relying upon an employer's *post-formation conduct*, however, would be subject to the four-year statute of limitations under § 1658, because they were made possible by the 1991 amendment."[62]  Robinson's claims are based on post-formation conduct, so they are subject to the four-year statute of limitations.  Assuming Robinson's claim accrued in September 2007, when he was allegedly promoted, the Complaint was filed on December 22, 2010—well before the four-year statute of limitations expired.

2.      **Policy or Custom**

---

[60]*Compare Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336, 1338–39 (11th Cir. 2008); *Ortiz v. City of New York*, 755 F. Supp. 2d 399, 408 (E.D.N.Y. 2010) (finding § 1983 claim timely under four year statute of limitations because it was made possible by the post-1990 enactment of the amendments to § 1981, even though that section is not the "remedial vehicle"); *with Trotter v. City of Park City*, No. 05-1311-WEB, 2007 WL 1712815, at *5 (D. Kan. June 12, 2007).  The Court notes that the Eleventh Circuit cases relied on by Judge Brown in *Trotter*, and by the City in this case, were decided before *Baker*.

[61]*Baker*, 531 F.3d at 1338–39.

[62]*Cross v. Home Depot*, 390 F.3d 1283, 1288 (10th Cir. 2004) (citing *Patterson v. McClean Credit Union*, 491 U.S. 164, 177–78 (1989)); *see also Brown*, 465 F.3d at 1188 n.3.

The City next argues that Robinson's claim for municipal liability under § 1983 fails because he cannot establish that the City's officials acted pursuant to a custom or policy of discriminatory employment practices.  The elements of a race discrimination claim under § 1981 or § 1983 are the same as a Title VII claim.[63]  The Court has already found that a genuine issue of material fact exists as to whether the City discriminated against Robinson when it failed to classify and pay him as a foreman.  But to establish municipal liability, Robinson must also "demonstrate that the City's officials acted pursuant to a 'custom or policy' of 'discriminatory employment practices.'"[64]  The Tenth Circuit has explained the policy or custom requirement as follows:

> An unconstitutional deprivation is caused by a municipal 'policy ' if it results from decisions of a duly constituted legislative body or an official whose acts may fairly be said to be those of the municipality itself."  *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1177 (10th Cir. 2003) (emphasis added). . . .
> A "'custom' has come to mean an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law." *Id.*  In order to establish a custom, the actions of the municipal employees must be "continuing, persistent and widespread." *Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993).  In attempting to prove the existence of such a "continuing, persistent and widespread" custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way.  Indeed, a plaintiff's "failure to allege the existence of similar discrimination as to others seriously undermines her claim that the City maintained a custom of discriminatory personnel practices." *Randle*, 69 F.3d at 447.[65]

Robinson argues first that he has come forward with evidence of a "custom" because the

---

[63] *E.g.*, *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008).

[64] *Id.*

[65] *Id.* at 1274.

City expressly announced its discriminatory practice of expecting employees to perform duties that are required by the manager without regard for the pay ordinance unless a PAF is filled out by the department head and approved, citing Archer's deposition testimony.  Robinson acknowledges as he must that there is no evidence of similarly-situated employees mistreated by the City.  Instead, Robinson urges that he is the only African-American employee ever assigned foreman duties and he was the only supervisor who was not paid in accordance with the Pay Ordinance.  But the fact that this is the only instance of an employee being subjected to discriminatory classification and compensation is fatal to his claim that such a practice is widespread.  Robinson not only fails to allege the existence of discrimination towards others, he relies on the fact that he is the only African-American employee who has been subjected to this treatment as evidence of pretext.  The Court finds no evidence that the practice of requiring African-American employees to perform duties higher than their pay grade and failing to pay them for the performance of such duties is so widespread as to have the force of law.

Robinson also argues that the City may be liable based on a "policy" because Archer's final decision regarding Robinson's classification and compensation was delegated to Baugher and can therefore constitute a municipal policy.  There can be no liability against a municipality under a *respondeat superior* theory under § 1983 for violation of rights enumerated in § 1981.[66]  But the actions of individual city officials may be said to represent the official policy of the City if they have "final policymaking authority."[67]  Identifying such officials is

> a legal question to be resolved by the trial judge before the case is submitted to the jury.  Reviewing the relevant legal materials, including state and local positive law, as well as 'custom or usage'

---

[66]*Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 736 (1989).

[67]*Id.*

> having the force of law, the trial judge must identify those officials
> or governmental bodies who speak with final policymaking
> authority for the local governmental actor concerning the action
> alleged to have caused the particular constitutional or statutory
> violation at issue.  Once those officials who have the power to
> make official policy on a particular issue have been identified, it is
> for the jury to determine whether *their* decisions have caused the
> deprivation of rights at issue by policies which affirmatively
> command that it occur.[68]

The Tenth Circuit has identified three elements to guide the Court in determining whether an individual is a "final policymaker": "(1) whether the official is meaningfully constrained 'by policies not of that official's own making;' (2) whether the official's decision[s] are final—i.e., are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority."[69]  And "policymaking authority is discovered by looking to the presence of legal authority rather than examining the facts of its exercise in a particular case."[70]

Robinson points to the Handbook provision that states the City Manager has authority for all personnel actions and that this authority may be delegated.  Because the City gave the City Manager or his delegate authority to make personnel decisions, Robinson maintains that his actions or his delegate's actions may be imputed to the City.  The City responds that while the City Manager may have had the authority to delegate these personnel decisions, Robinson cannot show that he in fact delegated this responsibility with respect to Robinson.  The City attaches the deposition testimony of Russell that he did not delegate authority to make personnel decisions;

---

[68]*Id* at 737 (citations omitted).

[69]*Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995) (citing *City of St. Louis v. Praprontnik*, 485 U.S. 112, 127 (1988); *Ware v. Unified Sch. Dist.*, 902 F.2d 815, 818 (10th Cir. 1990)).

[70]*Milligan-Hitt v. Bd. of Trustees of Sheridan Cnty. Sch. Dist. No. 2*, 523 F.3d 1219, 1228 (10th Cir. 2008).

Robinson attaches a declaration by Baugher that he had the authority to make personnel decisions.

The Court need not decide whether the City Manager in fact delegated his authority to Baugher to make promotion decisions.  Viewing the evidence in the light most favorable to Robinson's argument that Baugher did have the authority to promote, the City's policies make clear that he was not the final policymaker because his decisions were subject to review—Robinson appealed his decision to City Manager Archer and again to the Mediation Committee, who's decision was  "binding and final" on issues regarding an employee's "job, working conditions, [and] salary."  This authority, like the authority granted the City Manager, was delegated in the Handbook by the Board of Commissioners's resolution.

Morever, the City Manager or his delegate was meaningfully bound by the City's policies and procedures set forth in the Handbook.  As with the due process claims, they were constrained by the Handbook's requirement that employees with like duties and responsibilities be classified the same, and that a promoted employee be paid according to his appropriate classification.  Accordingly, Baugher's refusal to properly classify Robinson's job based on his promotion is not a "policy" for which the City can be held liable.  The City's motion for summary judgment on the § 1981 municipal liability claim is therefore granted.

C.      Section 1983 Due Process Claims

The Fourteenth Amendment provides that the states shall not "deprive any person of life, liberty, or property, without due process of law."[71]  Procedural due process claims are evaluated by asking first, "whether there exists a liberty or property interest which has been interfered with

---

[71]Const. amend. XIV, § 1.

by the State," and second, "whether the procedures attendant upon that deprivation were constitutionally sufficient."[72]  The Due Process clause also contains a substantive component, "barring certain government actions regardless of the fairness of the procedures used to implement them."[73]  Substantive due process "provides protection against arbitrary and oppressive government action, even when taken to further a legitimate governmental objective."[74]  Here, Robinson asserts procedural and substantive due process claims, both premised on his contention that the City deprived him of his right to be properly classified and compensated in his employment.  For his procedural due process claim, Robinson argues that he was not provided with the requisite notice and opportunity to be heard because at the mediation hearing, the City falsely claimed that the job description Robinson produced was not the same document created by Baugher, and that the City Manager communicated with a Committee member *ex parte*.  Robinson's substantive due process claim is that the City's deprivation of his property interest in being properly classified and compensated was arbitrary, capricious, and pretextual.

### 1.    Property Interest

Since both of Robinson's due process claims require the existence of a protected property interest, the Court first addresses the City's argument that Robinson has no property interest in being properly classified and compensated as a Labor Foreman.  Robinson argues that he has a contractual property interest in being compensated at the Labor Foreman rate because

---

[72]*Lauck v. Campbell Cnty.*, 627 F.3d 805, 811–12 (10th Cir. 2010) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).

[73]*Seegmiller v. LaVerkin City*, 528 F.3d 762, 766 (10th Cir. 2008).

[74]*Id.* at 767.

he was performing foreman duties beginning in September 2007.  Robinson further claims that he had a legitimate expectation that he would be classified and compensated as a Labor Foreman based on the City's representations to him under a promissory estoppel or an implied contract theory.

"The existence of a property interest is defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and support claims of entitlement to those benefits."[75]  These sources may include municipal charters or ordinances, and express and implied contracts.[76]

> Procedural detail in a statute or regulation, standing alone, is not sufficient to establish a protected property interest in an employment benefit.  However, if the statute or regulation places substantive restrictions on the discretion to demote an employee, such as providing that discipline may only be imposed for cause, then a property interest is created.[77]

Whether a property interest exists is a question of law.[78]  The Court addresses this question under Kansas law.

Robinson first points to the City's "policies and ordinances," stating that they created a contractual right sufficient to establish a property interest in the foreman classification.  The City responds that the Handbook is an insufficient source of any property right, pointing to its disclaimer that it is not a contract.  Yet the "policies, rules and regulations" in the Handbook were adopted by resolution of the Board of Commissioners and the City relies on many of these

---

[75]*Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998) (quotation omitted).

[76]*Schultz v. City of Longmont, Colo.*, 465 F.3d 433, 444 (10th Cir. 2006) (citing *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005)).

[77]*Hennigh*, 155 F.3d at 1254.

[78]*Burns v. Bd. of Comm'rs of Cnty. of Jackson, Kan.*, 197 F. Supp. 2d 1278, 1287 (D. Kan. 2002) (citing *Tarabishi v. McAlester Reg. Hosp.*, 827 F.2d 648, 651 (10th Cir. 1987)).

policies as a defense to their claim that Robinson lacks any property interest in his promotion.

The City further argues that the City's policies do not place any substantive restrictions on the City's personnel decisions, so they cannot form the basis of Robinson's property interest.[79]  The Handbook describes the "Classification Plan" as providing "an inventory of all positions in the City service which are sufficiently alike in duties and responsibilities to be called by the same job title, to be accorded the same pay scale and to require substantially the same qualifications on the part of the incumbents."[80]  The City's Classification Plan provides that City employees must be paid "respectively the amount set opposite the classification of their office or position, or within the range set forth in accordance with the City Budget for such purposes."[81]  The City argues that, once classified, the Classification Plan only requires that the City pay its employees within the range set forth for the classification.

Robinson responds that he was entitled to the 435/35 Labor Foreman classification under the 2008 Pay Ordinance because the Handbook provides that "[w]hen an employee is promoted to a position in a higher classification, the employee's salary will be increased to at least the minimum rate for the higher classification."  As described in the discussion of Robinson's Title VII claim, when viewed in the light most favorable to Robinson, the evidence shows he was promoted to the Sanitation Foreman position.  If the jury determines that he was promoted, it could also reasonably determine that Robinson should have been classified as a "Labor Foreman" under the 2008 Pay Ordinance, with a job code of 435 and pay grade of 35.  As the

---

[79]*See Teigen v. Renfrow*, 511 F.3d 1072, 1081 (10th Cir. 2007) ("it is well established that an entitlement to nothing but procedure cannot be the basis for a property interest").

[80]Doc. 152-1, Ex. A at A00294.

[81]Doc. 144-7, Ex. G.

Court has already found, a genuine issue of material fact exists as to whether Baugher had been delegated authority to promote Robinson and whether the promotion was valid without a PAF.

The Handbook states that the City Manager has authority for all personnel actions and that this authority may be delegated.  "A benefit is not a protected entitlement if government officials may grant or deny it in their discretion."[82]  "Without such details defining the contours of the alleged right and limiting the discretion of the state decisionmakers, these general provisions cannot give rise to a sufficiently definite property interest."[83]  But the promotion provision in the Handbook certainly limits the City Manager or his delegate's authority. According to the Handbook, neither Russell nor Baugher could have denied Robinson the appropriate classification and pay under the Pay Ordinance if he was in fact promoted.  Again, Robinson does not claim that he was denied the right to be promoted.  He claims that he was in fact promoted, and that despite performing the increased supervisory duties associated with that promotion, he was denied the requisite increase in pay.  While Robinson may not have a property interest in receiving a promotion in the first instance, if the jury determines he was promoted, the Court finds he has a property interest in the classification and pay grade for that new position.  The City's policies amount to more than procedural protections: they created a protectable property interest in the correct classification and compensation for employees who are in fact promoted.

An implied contract under Kansas law "depends on the intent of the parties, divined from the totality of the circumstances."[84] The existence of a disclaimer in the employee handbook does

---

[82]*Schultz*, 465 F.3d at 444.

[83]*Teigen v. Renfrow*, 511 F.3d 1072, 1081 (10th Cir. 2007).

[84]*Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 537 (10th Cir. 1995).

not determine the issue as a matter of law.[85]  While the existence of an implied contract for employment is normally a question of fact for the jury, summary judgment may be appropriate when the plaintiff fails to present evidence of "'anything above and beyond the terms of the personnel manual.'"[86]  Under Kansas law, to invoke the doctrine of promissory estoppel, a plaintiff must come forward with evidence that the "promise was made under circumstances where the promisor intended and reasonably expected that the promise would be relied upon by the promisee and further that the promisee acted reasonably in relying upon the promise."[87]

Robinson points to multiple oral representations by Baugher that he had been promoted, to the October 2007 job description reflecting his new duties and confirming the job code and pay grade, to his pre-evaluation form, to the increased supervisory role that he played after October 2007, and to the fact that the City held him out to the public as a foreman.  Robinson argues that this evidence, when viewed in the light most favorable to him, suggests that he had a legitimate expectation of being classified as a foreman and being compensated accordingly.  The Court agrees that this evidence, which goes above and beyond the terms of the Handbook, suggests that the parties agreed that Plaintiff had been promoted to the Labor Foreman position and that Plaintiff reasonably relied on the City's representations to his detriment.

The City argues that Robinson cannot show more than a unilateral expectation of a wage increase.  The Court disagrees. Viewing the evidence in the light most favorable to Robinson, he reasonably relied on Baugher's representations and on personnel documents showing that he had been promoted into a supervisory foreman position.  Under the City's policies, Baugher could

---

[85]*Id.* at 538 (discussing *Morriss*, 738 P.2d at 849).

[86]*Id.* (quoting *Farthing v. City of Shawnee, Kan.*, 39 F.3d 1131, 1140 (10th Cir. 1994)).

[87]*Patrons Mut. Ins. Ass'n v. Union Gas Sys., Inc.*, 830 P.2d 35, 39 (Kan. 1992).

promote Robinson if such authority was delegated by the City Manager.[88]  While City Manager Russell denies delegating this authority to Baugher, other evidence such as Baugher's December 2008 affidavit, suggests that Baugher was empowered to make such personnel decisions.  This is further supported by evidence that shows Baugher apparently authorized hiring Blass in a position that did not exist in the Pay Ordinance.  And Robinson proceeded to take classes and to take on a much more demanding role as a supervisor in the sanitation department at Baugher's behest, circumstantial evidence that he was authorized to do so.  The record is replete with instances where Baugher held Robinson out to be a foreman or supervisor both to Robinson and to others.  Robinson reasonably relied on Baugher's statements, actions and personnel forms in believing that the PAF had been executed finalizing his promotion.

For all of the above-stated reasons, the Court finds that Robinson has a protected property interest in being properly classified and paid as a labor foreman if the jury determines that he was promoted to that position.

## 2.      Procedural Due Process

The City next argues that even if Robinson has a protectable property interest in being appropriately classified and paid, there is no evidence that the City interfered with that right because since he was not promoted, he is classified and paid appropriately as a Maintenance Worker III.  This argument is one and the same as the City's argument that Plaintiff has no protectable property interest in the foreman classification because he was not promoted.  But as described in the previous section, there is a genuine dispute of material fact about whether Robinson was promoted.  If the jury finds that he was promoted, it could also reasonably find

---

[88]*See Schultz*, 465 F.3d at 442 (finding no justifiable reliance, in part, based on the fact that the City administrators did not have the authority to pay a step increase without City Council approval).

that the City interfered with that right by not classifying him accordingly.

The City does not move for summary judgment on the issue of whether Plaintiff was provided with sufficient process, so the Court need not address this issue.

### 3.      Substantive Due Process

To show that the City violated his substantive due process right to be properly classified and paid, Robinson must also show that the City's challenged action was arbitrary, capricious, or without a rational basis.[89]  The City argues that Robinson cannot make this showing because it is undisputed that the promotion lacked the requisite City Manager approval.  But as already explained, the Court finds a genuine issue of material fact exists as to whether the City Manager delegated his authority to Baugher for personnel decisions, and whether the promotion required City Manager approval at all, given that the provision cited by the City only requires City Manager approval for "appointments."  Given the Handbook's separate references to promotions and appointments, the Court finds this interpretation to be reasonable.  The City's motion for summary judgment on the substantive due process claim is denied.

### D.      Kansas Wage Payment Act

The KWPA states that "[e]very employer shall pay all wages due to the employees of the employer at least once during each calendar month."[90]  The statute defines "wages" as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis less authorized withholding and deductions."[91]

---

[89]*Crider v. Bd. of Cnty. Comm'rs of Cnty. of Boulder*, 246 F.3d 1285, 1289 (10th Cir. 2001); *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1257 (10th Cir. 1998).

[90]K.S.A. § 44-314(a).

[91]*Id.* § 44-313(c).

When an employer willfully fails to pay an employee his or her "wages due," the employer is liable for both the wages due and a penalty in an amount up to 100% of the unpaid wages.[92] "The KWPA, then, does not provide plaintiffs with any substantive rights, but simply provides a mechanism for plaintiffs to recover wages due.  In such circumstances, plaintiffs must establish independently that they are entitled to the wages that they seek."[93]

Because the Court has found genuine issues of material fact about whether Robinson was promoted by the City and whether he was properly classified and paid after September 2007, there is a genuine issue of material fact about whether Plaintiff is independently entitled to the wages he seeks.  Summary judgment is denied on the KWPA claim.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 143) is **granted in part and denied in part**.  The motion is granted on the municipal liability claim under 42 U.S.C. § 1981 and otherwise denied.

**IT IS SO ORDERED**.

Dated: September 4, 2012

 S/ Julie A. Robinson                           

JULIE A. ROBINSON

UNITED STATES DISTRICT JUDGE

---

[92]*Id.* § 44-315(b).

[93]*Garcia v. Tyson Foods, Inc.*, 766 F. Supp. 2d 1167, 1187 (D. Kan. 2011).

46