## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **TRENCE ROBINSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **vs.** | ) | **Case No. 10-1431-JAR** |
| | ) | |
| **CITY OF ARKANSAS CITY,** | ) | |
| **KANSAS,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

This is an employment discrimination and due process case brought by a municipal employee.  Plaintiff Trence Robinson asserts claims against the City of Arkansas City, Kansas, relating to its failure to properly classify and pay him as a labor foreman.  He asserts claims for race discrimination under Title VII of the Civil Rights Act of 1964, and for due process violations under 42 U.S.C. § 1983 associated with the Mediation Committee's decision that he was not promoted and therefore not entitled to the labor foreman classification and pay grade. He also alleges a state law claim under the Kansas Wage Payment Act ("KWPA").  These claims were tried to the Court and this decision represents the Court's findings of fact and conclusions of law as required by Fed. R. Civ. P. 52.  As described more fully below, the Court finds in favor of Plaintiff on all claims.

### I.      Findings of Fact

The City is a municipal corporation operating under the Commission-Manager form of government.  Each year, the Commission adopts a Pay Ordinance, also called a Classification

Plan, as described in the City's Personnel Policy Handbook ("Handbook"):

> The City Manager is responsible for recommending to the City Commission a uniform and equitable pay plan. Such plan shall annually be a part of the recommended budget. . . . The pay plan shall reflect an equitable relationship among the job classifications and shall be made after review of . . . [the] responsibilities of the position, and the policies of the City.
>
> The City Commission shall formally adopt a pay plan ordinance, which . . . shall establish minimum and maximum rate [sic] of pay for each class. All employees are to be paid within this range . . . .[1]

The Pay Ordinance "provides an inventory of all positions in the City service which are sufficiently alike in duties and responsibilities to be called by the same job title, to be accorded the same pay scale and to require substantially the same qualifications on the part of the incumbents."[2]

The Commission delegated "authority for all personnel actions, including hiring, promotion, discipline and dismissal" to the City Manager.[3]  The City "maintain[s] a job description for each classification" that is "intended to indicate generally the kinds of activities performed by the established classification."[4]  In June 1994, the City created Public-Works-wide Maintenance Worker ("MW") III and Labor Foreman job descriptions that correlate to the classifications on the Pay Ordinance, although not necessarily to specific positions.

Plaintiff Trence Robinson started working for the City of Arkansas City in 1994, primarily in the sanitation division of the Public Service Building and Grounds ("PSBG") department .  He also performed other duties over the years, including code enforcement and

---

[1]Ex. 402 at A00294.

[2]*Id.* at A00295.

[3]*Id.* at A00291.

[4]*Id.* at A00294.

nuisance abatement.  Robinson eventually was promoted from MWI to MWII, and in 2004, he was promoted to MWIII.  After his promotion to MWIII, Robinson also had daily responsibility for supervising twelve to thirteen inmates from the Kansas Department of Corrections, who served as day laborers for the sanitation division.

There was considerable conflicting testimony about the structure of the PSBG department.  It is undisputed that until 2001, the sanitation division included not only maintenance worker grade employees, but also a labor foreman, sometimes called "sanitation foreman."  This position was held by Don Cook until 1992, when Cook retired.  The duties of the sanitation foreman, like the duties of foremen in other divisions of the department, included supervising, evaluating, and disciplining employees.  But after Cook retired, although the Pay Ordinance included a position for labor foreman under the PSBG department through 2008, there was no employee in the sanitation division at the foreman position.  Jim Miller, who was the superintendent of the PSBG department at that time, testified that Cook's position was not filled for budgetary reasons.   Miller took over most of the foremen duties, but at times had others perform some of the duties.  In fact, Dave Nichols, a MWIII, served as "assistant sanitation foreman."  Miller testified that he was unwilling to promote Nichols because he was not sure he was capable of being a supervisor.  Miller considered three other men as potential supervisors: Tony Tapia, who is now the Building and Grounds superintendent, Marcus Lynn, who became sexton of the cemetery, and Robinson.  Miller retired in 2001, and Gary Baugher was eventually hired to replace him as superintendent of the PSBG department.  It was Baugher who promoted Robinson to Maintenance Worker III in 2004.

By 2007, Baugher felt the need for more supervision of the sanitation employees, for they

were incurring excessive overtime.  In July 2007, with then-City Manager Doug Russell's support, Baugher assigned Nichols' supervisory duties to Robinson and instructed him to reduce overtime.  Russell and Baugher also discussed a permanent "reorganization" of the sanitation division, and by August 15, 2007, a plan for reorganizing the division—with a foreman overseeing the maintenance workers—was presented to Russell.  Russell supported the plan.

The heart of this dispute is whether Baugher promoted Robinson to this supervisory labor foreman position, or whether he was merely "test-driving" Robinson to see if he was capable of the position.  In September 2007, Baugher offered Robinson the sanitation foreman position and told him he would need to take several computer and leadership courses.  Robinson certainly believed that Baugher had promoted him.  Baugher gave Robinson a job description for "Sanitation Foreman," and had him sign it in acknowledgment of his new duties.[5]  Robinson testified that Baugher asked Robinson if he wanted the job.  It is undisputed that Baugher had first talked to Nichols about assuming additional supervisory responsibilities in light of the division's problems with overtime.  And it is undisputed that Nichols declined.  Although Nichols was performing some supervisory duties, he was not interested in taking on more and in being responsible for generating reports by computer.  Robinson, on the other hand, was excited at the opportunity to become a supervisor and to take on all supervisory duties listed in the job description, including undertaking computer training.  In any case, Robinson was expected to perform all of the duties on the job description of sanitation foreman, including supervising and evaluating employees.  And he took on other duties, including taking bids for new mowers. Other supervisors and long term employees all testified that, other than Robinson, they had never

[5]Ex. 56.

4

experienced a MWIII or other non-supervisory employee directly evaluate or discipline other maintenance workers, including a MWIII.  Before the promotion, Baugher, and not Nichols, evaluated Robinson.

Robinson produced the copy of the job description given to him by Baugher to show that he was in fact promoted.  Robinson's job description included the job code 435 and pay grade 35—the labor foreman job code and pay grade; there is no red ink on this version.  The City produced a copy with red ink in several places, claiming that Baugher gave Robinson a draft and that he was not then promoted.  The City also insisted that Baugher did not give Robinson a job description that included the code and grade.  The Court believes Robinson's testimony and evidence, not the City's.

According to Miller, the job description that Baugher had Robinson sign recited the same responsibilities that Cook had when he had been sanitation foreman.  Baugher at least considered Robinson a potential supervisor, based on his exemplary skills, ability, and devotion to the City.  Robinson never had taken a sick day in all those years and always accepted additional assignments as needed.

Several City employees testified that it was not possible that Baugher promoted Robinson.  The City insisted that a promotion was not valid unless three steps were satisfied: city manager approval as evidenced by Personnel Action Form ("PAF"), City Commission approval of the classification as evidenced by the Pay Ordinance; and budgetary approval.  But the City's argument that these were prerequisites to Robinson's promotion fails for several reasons.

***City Manager Approval; PAFs***

The City contends that the first prerequisite to a promotion is approval by the City

Manager, as documented on a PAF.  Many such PAFs were admitted in evidence, illustrating that the City documented personnel action on Robinson and other employees who were promoted, evaluated, or disciplined.  Although there were PAFs in Robinson's personnel file, there was no PAF for his promotion to foreman, and the City claimed no such PAF was ever completed.  Gary Baugher testified that he did not do a PAF because he had no intent to promote Robinson.

The Court nevertheless finds that the Handbook only requires PAFs for "appointments" (i.e., new hires), not "promotions."  The Handbook would make no sense if "appointments" included "promotions," because it distinguishes in several sections between the procedures and rules applicable to appointments and promotions.

Still, even if the Handbook does not require a PAF, the City argues that the custom and practice at the City was to require City Managers' approval in the form of PAFs to effectuate promotions.  Russell testified that Baugher never gained oral or written approval from him to promote Robinson or to change his job classification and pay grade.  But this testimony was largely discredited.  Robinson, Miller, Mary Bartlett, and others testified that in 2007, Baugher was in the process of reorganizing the Public Service Department, and as part of that process decided to promote Robinson to sanitation foreman, although there had not been a foreman position in sanitation since Cook retired in 1992.  Russell denied this in his testimony.  He testified that he did not recall he and Baugher changing any existing job descriptions.  This testimony was soundly impeached when Robinson produced an August 15, 2007, organizational chart from Russell's own hard drive that demonstrated indeed there was some plan or idea for sanitation to have its own supervisor rather than reporting to the streets division.  Russell's own

6

performance evaluation in 2007 shows that he supported "sanitation reorganization" and "decreased overtime."[6]

There was other evidence in the record showing that Baugher, upon becoming supervisor, was in the process of not only reorganizing, but also increasing staffing in the PSBG department. Russell testified that one of Baugher's goals was to generate leadership in employees. And a review of the budgets for 2007 through 2009 show incremental increases in budget requests and staffing. In fact, the evidence demonstrates that Baugher and Russell were involved in reorganizing and restructuring the PSBG department. Over a three-year period, Baugher increased his staffing requests from 32.05 full time employees in 2007, to 33.75 in 2008, and to 36 in 2009. In the sanitation division alone, Baugher and Russell communicated about reclassifying and regrading job positions.

Marla McFarland, the City's human resources manager, testified at length that she was unaware of any PAF documenting that Robinson had been promoted. She testified that, until the supervisor created a PAF, and the City Manager signed the PAF, she was not authorized and in fact did not increase the employee's pay or make other changes in the database that would change the person's job title. She also firmly testified that neither she nor anyone else ever signed for the City Manager, denying that the City Manager's signature was pro forma, and insisting that the City Manager proactively approved every promotion. She also insisted that PAF forms were always completed before personnel actions took place. This testimony was impeached in two steps. First, McFarland was shown a July 11, 2008 email in which Waugh

---

[6]Ex. 143.

told Baugher that she had "forged" his signature on a PAF since he forgot to sign it.[7]  She testified that this email was merely a joke.  Then McFarland was shown another email, Exhibit 93, sent to City Manager Steve Archer and payroll clerk Cindy Waugh on November 21, 2008, in which she proposed asking department heads to submit PAFs after the fact, to clean up her files, and that they should notate on a log any employment changes among their staff, so she could update her records.  This of course directly contradicted her insistence that PAFs signed by the City Manager were a prerequisite for her to recognize promotions or other personnel action in terms of hiring, pay, or benefits.  Indeed, one new employee, Chuck Blass, received orientation from her before the City Manager signed the PAF approving his hiring.  This impeachment evidence shows that McFarland operated without timely PAFs to such a degree that she felt it necessary to clean up her books by having supervisors submit PAFs after the fact and provide information about personnel actions they had taken without prior documentation.

Randy Jacobs, who was supervisor of the streets department, testified that Robinson was not promoted, yet in his deposition he testified that he did not know whether Robinson had been promoted.  He testified that while Robinson did evaluations and disciplinary reports on other maintenance workers, he knew of no one else, other than supervisors, who had ever done evaluations or disciplinary reports.

Finally, Cindy Waugh testified that she signed and returned the PAFs to McFarland after all of the requisite signatures were gathered and that the PAF was a prerequisite to new hires and promotions.  This testimony was also unequivocally impeached by her own emails, including

---

[7]Ex. 92.

one to Baugher stating that she "forged" his electronic signature on two PAFs.[8]  In another

August 11, 2008 email, she told Baugher that she "just used your signature here to sign

these—hope that was ok."

Although Russell, Baugher, and McFarland testified that Robinson was not promoted, the

Court gives great weight to the testimony of another employee, whose credibility was not called

into question like the credibility of the aforementioned City employees.  Mary Bartlett, the

PSBG secretary, testified that in October 2007, Baugher told her that he was going to promote

Robinson to sanitation foreman, and that he had first offered the promotion to Nichols who

turned it down because he was unwilling to work with computers.  Bartlett testified that she told

Baugher she thought this was a wise decision, because Robinson was very capable.  And,

Bartlett later attended a surprise party hosted by Robinson's family to celebrate the promotion,

proud of the fact that Robinson was the first black in a foreman position in the Public Service

Department of Arkansas City.  Some of Robinson's work colleagues attended the party in

celebration of his promotion.  Bartlett also opined in a letter she wrote in April 2008 that

Baugher was a bully and that she perceived that racism was involved in his treatment of

Robinson.

***Approval by City Commission; Pay Ordinance***

The City further insisted that the second prerequisite for promotion would have been

approval of the position as documented in the Pay Ordinance.  Although the labor foreman

position had not been filled since Cook left, the position was in the 2007 Pay Ordinance, so this

requirement was met.

---

[8]Ex. 92.

*Approval in the Budget*

The City insisted as a third prerequisite that a new position, or filling a long vacant position, must be approved by the City Commission in its annual budget.  But the preponderance of the evidence demonstrated two things.  First, the City Council approved a budget by overall department expense, not by line item expenses for each individual employee.  Second, despite this so-called firm requirement, Blass was hired in July 2008 as stormwater superintendent even though no such position was included in the 2008 Pay Ordinance, and was not approved in either the 2008 or 2009 budget.[9]  Instead, City employees testified that this was merely an oversight; that for two years there had been plans to hire stormwater employees to alleviate the burden on streets division employees performing that work.

Notably however, the documentation showed plans to hire two maintenance level employees in stormwater, not to hire a maintenance laborer and supervisor, an obviously more expensive alternative.  What this suggests to the Court is that the budget process was in design and practice undertaken at the macro level; indeed, both city managers testified that the City Council approved ceilings for the departments' expenditures.  Thus, it was within the City's providence to hire a supervisor and maintenance worker rather than two maintenance workers in stormwater.  Similarly, it was within the City's providence to promote Robinson to supervisor, and pay him more, to reduce significant overtime pay expenses.

Archer testified that the budget ordinance sets the maximum number of people that can be hired in each department, and absent City Commission approval, a department cannot exceed

---

[9]Baugher sent a memo to Archer on July 8, 2008, recommending changes to the 2008 budget that included under the code "435" for public works, "Change to Asst. Supt. Storm Water" with "same grade 35."  Ex. 150.  This was written six days before Blass started his job.

that maximum number.  But if hiring a new employee would not exceed that budget ceiling, and

the position is within an existing classification, City Commission approval is not necessary.

Thus, under the facts established in this case, promotion of Robinson to the labor foreman

classification, which already existing in the Pay Ordinance, could have been accomplished.

Archer also testified that he presented to the City Commission increased staffing needs for newly

created positions, and for promotions not provided for in the existing budget, although he usually

discussed other promotions if they constituted a significant increase in pay.  Mark Paton, who

has previously served on the City Commission, testified that the City Commission did not

approve promotions—they would only get involved if it involved creating a new job

classification.  The Court finds that Robinson's promotion did not require City Commission

approval.

        Instead, the Court finds that Russell and Baugher were engaged in a process that

ultimately did not enjoy the support of the City Commission.  Although Russell denied this in his

testimony, he was impeached with evidence that he kept numerous revisions of organizational

charts on his computer hard drive.  Indeed, Russell testified that he left the City when his vision

and the City Commission's vision deviated.  As part of this process, Baugher revised job

descriptions for the supervisors who reported to him: Robinson, Tapia, and Jacobs.  He

collaborated with McFarland, who kept job descriptions that Baugher submitted to her, as

evidenced by the emails between them.  One of these revised job descriptions for a MWI stated

that the employee worked under the "sanitation supervisor."  Baugher revised job descriptions

for Tapia, Jacobs, and Robinson on October 16, 2007, and sent them to McFarland, asking her to

review and make suggestions.  Jacobs' and Tapia's job descriptions each included a job code and

grade, but Robinson's sanitation foreman job description did not.[10]  The job description produced

by Robinson that includes a job code and grade was signed by him on October 17, 2007.

McFarland could not recall whether she made suggestions to Baugher as he had requested in his

email, but the Court finds by a preponderance of the evidence that Baugher added the job code

and grade before giving it to Robinson for signature, most likely at the direction of McFarland.

The circumstantial evidence also suggests that Baugher required this information from

McFarland because Robinson's job description was for a promotion, whereas Tapia and Jacobs

remained in the same job code and grade that they held previously.

***Other Evidence that Robinson was Promoted***

There is a host of other circumstantial evidence suggesting that the City recognized

Robinson as a labor foreman who supervised the sanitation department.  First, Robinson began

attending all supervisor meetings; in fact, Baugher announced to the sanitation staff that

Robinson was their new boss.  Bartlett heard Baugher make this announcement.  In a February

2008 email regarding emergency contacts, Baugher referred to Robinson as "sanitation

foreman," to Bob Whyde as cemetery foreman, and to Tapia and Jacobs as assistant

superintendents.[11]  Nichols had attended only some supervisor meetings in the past, but Robinson

attended all of them at Baugher's direction.  Robinson also began attending the safety meetings

for supervisors; non-supervisory employees had a separate safety meeting.  The other

supervisors thought Robinson had been promoted to supervisor.

There is, someone at the City issued Robinson a new employee badge identifying him as

---

[10]Exs. 46–48.

[11]Ex. 67.

sanitation foreman.  The badges were maintained in a database accessed only by McFarland and two other employees: Nancy Crain and Leslie Shook, the City Clerk.  Robinson testified that it was Shook who made his badge.  At this point, Robinson admittedly had little to no computer skills.  There is no dispute that Robinson had no access to make his own badge.  And, the Court believes Robinson's testimony that he did not direct anyone as to the content of his badge; the information was already in the database.

Third, Robinson, at Baugher's direction, began completing evaluations and disciplining maintenance workers in the sanitation division.  Robinson signed numerous evaluations and other documents as sanitation foreman.  Robinson even signed Nichols' evaluations in November 2007 and July 2008.  Robinson also signed a number of disciplinary reports signifying his taking disciplinary actions on certain employees.  During this time, neither Baugher nor any other City supervisor objected to Robinson signing the documents in this expressed capacity.  In fact, while disclaiming knowledge that Baugher had promoted Robinson, Russell, Baugher and Robinson all signed a disciplinary action report for one employee in January 2008.  Robinson signed this report as "foreman."  Again, this suggests that either Russell was aware that Robinson was now supervising, evaluating and disciplining employees; or if Russell was not aware, that his signature on these various PAFs and disciplinary documents was pro forma—that in practice his prior approval was not really necessary for promotions or disciplinary actions.

Fourth, Baugher started evaluating Robinson under the review process used for those promoted to supervisory positions or other permanent positions.  Although supervisors always had the discretion to evaluate employees more often, they typically evaluated employees only

13

once a year, on a regular cycle.  Archer testified that supervisor would exercise discretion to

evaluate more often in the situation where an employee was in an "acting" or "test-drive"

position.  But when an employee was promoted to a supervisory position, the Handbook

directed, and the City's practice was, to evaluate the employee every six months to assess how

they were handling the new position.  This six month probationary period is to begin

immediately upon appointment to a permanent position—time spent in an "acting" or "test-

drive" capacity does not count toward the probationary period provided for in the Handbook.

Baugher started evaluating Robinson on a six month cycle, beginning with the period September

2007 to March 2008.  In fact, there is an entry on Baugher's March 2008 calendar signifying the

end of "Trence's Probationary Period."  In October 2007, Baugher and Robinson signed off on a

Performance Enhancement Program Review form, which included expectations that Robinson

would obtain computer training and establish a good safety record in his division.

  Fifth, as part of that six-month Performance Enhancement process, Robinson took

numerous college courses on computers and other managerial skills, which Baugher reviewed as

well.  Baugher testified that he did not discuss with Robinson taking college courses and that he

did not consider Robinson qualified to be a sanitation foreman, but the Court does not find this

testimony to be credible in light a preponderance of the evidence to the contrary.

  Once Robinson began supervising the sanitation employees, the overtime expense

diminished.  And Robinson had considerable supervisory responsibility—not only did he

supervise nine to eleven sanitation maintenance workers, he was responsible for overseeing

twelve to thirteen inmate laborers each day.  Other supervisors at the foreman level had fewer

employees; indeed, Blass, while having some specialized duties and reporting duties, only

14

supervised one maintenance worker.

Although Nichols had performed some of the same duties, he did not perform all the duties that Baugher assigned to Robinson, for Robinson not only supervised the employees, he also evaluated them, including Nichols, a MWIII.  There is no evidence that Nichols evaluated any MWIII, including Robinson who would have been under his supervision according to the City's argument.  And Robinson disciplined far more employees, although there was evidence that Nichols had signed off on a few disciplinary forms over the years. Robinson also wrote policies and procedures for the sanitation division, until about 2010, and attended training on computer skills; training that Nichols declined.

All indicia point to Robinson having been promoted, except one; he never received a pay increase commensurate with a promotion to job code 435, pay grade 35.  Indeed he never received any pay increase until Baugher agreed to a $1 per hour raise in April 2008.  In contrast, when Tapia and Jacobs were promoted from MWIII to assistant superintendent, they each received pay increases.

Robinson thought he was promoted in October 2007, but did not ask why his paycheck did not reflect the promotion until late 2007 or early 2008.  He then asked McFarland why his pay had not increased.  Rather than investigating this, as she did with many grievances, she told him to talk to Baugher.  When Robinson talked to Baugher, Baugher angrily denied that he had promoted him, threatened to replace him with Nichols.  Robinson returned to talk to McFarland, this time showing her the job description he had signed.  McFarland again sent Robinson to talk to Baugher, who threatened Robinson with an accusation of insubordination.

After this, Baugher reviewed Robinson under the six-month Performance Enhancement

Review process for the period September 2007 through March 2008.  Baugher's evaluation,

which he signed on April 10, 2008, identified Robinson as "Sanitation Foreman (Maintenance

III)," whereas the prior evaluation form had simply identified him as sanitation foreman.[12]

Robinson refused to sign this April 2008 evaluation because, for the first time, the evaluation

was critical, and he believed retaliatory.  Even after the April 2008 evaluation, Robinson

continued to attend supervisor meetings and to act as a supervisor in all respects.  In June 2008,

Robinson signed a disciplinary action form as "Foreman"; Baugher and the new City Manager,

Steve Archer, also signed this disciplinary form.

### Grievance Process

On May 15, 2008, Robinson's counsel sent a letter to the City, seeking back pay "at the

rate that is due a Sanitation Foreman" and pay "at the rate due a Sanitation Foreman for all future

pay periods."  The City insisted that Robinson exhaust the City's Grievance Procedure, which

includes a discussion with the City Manager and submission of a complaint to the Mediation

Committee.  Robinson met with Archer on July 29, 2008, and on August 6, 2008, Archer denied

Robinson's appeal in writing on the ground that "no promotion took place" because "[t]he City

does not have a Sanitation Foreman position in our classification and pay plan," and because an

appointment to a position must be initiated by a PAF, which was never filled out for Robinson's

promotion.  Archer's position is and was that an employee cannot expect to be paid for the actual

work performed, if requested by his manager, unless the manager actually fills out a PAF.

Once Robinson filed his grievance with the City, Baugher began systematically removing

his supervisory duties.  All of the indicia that Robinson had been promoted were eliminated after

---

[12]Ex. 72.

Robinson filed the grievance.  Moreover, although Robinson had never received a disciplinary report of any type from 1994 to 2007, after filing the grievance he received several disciplinary reports.  He was disciplined for signing documents as "Sanitation Foreman," during those months that he had done so under the direction of Baugher, including documents that had been signed off by the City Manager as well.  Robinson was even disciplined in June 2009 for an accident by David Beasley, a MWI in sanitation, that occurred in Robinson's absence, in his capacity as Beasley's supervisor.  Ironically, Robinson was told he was not the supervisor, yet he was held accountable for the safety performance of Beasley, even though the City's Safety Manual held only supervisors accountable for the safety performance of maintenance workers. Jacobs, who the City contended was Beasley's supervisor at that time, did not get disciplined for the incident.  When Robinson complained to Archer in June 2009 about being disciplined for this incident, Archer replied that Robinson was "the mainstream supervisor" out there.

Robinson appealed Archer's decision to a Mediation Committee ("Committee").  The Committee was comprised of Mark Paton, Judy Reedy, and Charles Jennings.  Robinson was represented by counsel; both Robinson and the City presented evidence.  Each party and the Committee members were given the opportunity to cross-examine the witnesses.  The hearing to resolve his grievance began on December 8, 2008.  The veracity of the job description produced by Robinson, Exhibit 56, first arose during Robinson's this hearing, when the City suggested that the job description produced by Robinson had been altered to add the job code and Pay grade. The City also claimed that the sanitation division was "part of the streets departments (sic)" reporting to Jacobs.  After about an hour, the hearing had to be postponed and was continued to December 30th.

17

In the interim, Robinson's lawyers and Committee member Jennings asked the City to produce the metadata for the documents in question.  The City initially asked for a longer continuance in order to gather the requested metadata, but the Committee denied the request. Instead, the Committee allowed a "window of one to two weeks" after the hearing to produce the metadata and any other information requested by the Committee.  In a letter to Robinson's counsel, a City attorney admitted that the City had a draft job description with the job code and grade for sanitation foreman,[13] but did not communicate this information to the Committee. And, at the hearing, the City presented versions of Jacobs' and Tapia's job descriptions that also lacked job code and grade numbers, representing that the properties of the native format versions of these documents showed creation dates of mid-October 2007.  The City relied on this evidence and in arguing that Robinson had not been promoted.

Consistent with Archer's grievance denial, the City argued to the Committee that Robinson could not have been promoted because the "Sanitation Foreman" position was not on the Pay Ordinance and because it did not have a PAF documenting the promotion.  Citing to the sanitation departmental expenditures page in the City's 2008 Budget document, the City also claimed that the Commission had not budgeted a "foreman" position for the sanitation division. In contrast, the City falsely explained that the July 14, 2008, appointment of Blass to the assistant stormwater superintendent position was an example of a personnel action that complied with all three of the prerequisites.

On December 31, 2008, Jennings reiterated his request to authenticate the job descriptions and separately requested information supporting the City's claim regarding the

---

[13]Ex. 196.

process used to appoint Blass.  Robinson did not learn that the City had responded to these requests until after the Committee issued its decision.  Based on the information available to the Committee, two members (Paton and Reedy) adopted the City's position that Robinson had not been promoted because a PAF had not been completed, "Sanitation Foreman" was not listed on the Pay Ordinance, and the City had not budgeted for the position.  While the Committee did recommend that Robinson receive another $1 per hour raise for assuming additional duties, it did not direct the City to classify Robinson as a foreman.

The City ultimately claimed it was too expensive to produce the metadata, estimating that it would cost about $10,000.  In fact, one of the arbitrators, Paton, had an ex parte conversation by email and phone with Archer about the prohibitive cost of the metadata, and this arbitrator, who served as chair of the panel, told the City not to produce it.

But in this action, metadata was produced.  In fact, by producing these various documents in electronic form, certain metadata was instantly accessible by simply opening these Microsoft Word® documents, and looking at each document properties screen.  Robinson illustrated this during trial, and the Court was able to see document properties such as when the document was created, when it was last modified, and when it was last accessed.  All of this evidence established, by a strong preponderance of the evidence that Baugher had modified the job description in his computer drive to delete the code and grade from his so-called "draft" job description.  This was a thinly disguised attempt to alter the evidence to fit Baugher's story that he never in fact promoted Robinson.

The City deliberately misled the Mediation Committee by withholding material information and by misrepresenting facts about the job descriptions, the structure of the public

19

works department, the budget document, and the cost of obtaining metadata information.  First, it submitted an altered Sanitation Foreman job description, without job code and pay grade numbers, to the Committee as "the one" Baugher drafted, claimed it had "never seen" Robinson's version with the 435/35 information, and suggested, instead, that Robinson must have fabricated his version of the job description.

Second, it altered Tapia's and Jacobs' job descriptions to remove the job code and pay grade numbers a few hours after the hearing commenced on December 8, 2008, presented the altered documents to the Committee on December 30 to corroborate the authenticity of its version of Robinson's job description, and represented that the document metadata showed that the documents were created in mid-October 2007, without producing the metadata or disclosing that it also showed that these documents had been altered on December 8, 2008.[14]  The City held off on producing the document metadata to the Committee (even though the City's counsel had accessed this data) prior to the December 30th hearing, and likewise withheld the information from the Committee (and Robinson) after the hearing ended.  The City withheld from Robinson and the Committee, even after the hearing, the document metadata that the City already had reviewed, which would have revealed that the City had altered the documents it presented to the Committee.

Third, the City insisted that Robinson could not be classified or paid as a labor foreman unless the City took certain "immutable" steps, citing Blass's appointment as an example of meeting those criteria, even though the City knew its argument was "inconsisten[t]" with the process used to hire Blass.

---

[14]*See* Exs. 185, 187, 191.

Fourth, the City testified falsely that there could be no Sanitation Foreman because the sanitation division reported to Jacobs in the streets department (and not directly to Baugher, as a foreman would), even though Robinson did not report to Jacobs and neither the organizational chart in Russell's files nor the version in the Handbook adopted by the Commission on December 2, 2008, show sanitation reporting to streets.  Just days before the hearing, on December 3rd, the Handbook organizational chart showing the sanitation and streets divisions as co-equals was deleted, and a new chart was inserted, showing sanitation reporting to streets, consistent with the City's position at the hearing five days later.  According to the metadata, the new chart was inserted by user Nancy Crain, Archer's former secretary.  But this was not possible because she was deceased at the time of the modification.  Notably, the City Commission had just approved a new handbook with the old chart on December 2, 2008, one day before the substitution was made.

Fifth, the City responded ex parte to Jennings's request for information about Blass's appointment by providing new and material information.  Archer emailed Paton, attaching misleading excerpts from the City's 2008 budget document that referenced the creation of two stormwater positions, but excluded the stormwater expenditures page that showed (similar to sanitation) that the positions were designated as MWI and MWIII.  The City also responded ex parte to Jennings' request for metadata by providing new and material information to Paton.  This information convinced Paton to ignore Jennings's request for metadata, which would have impeached the City's proffered justification for not properly classifying and paying Robinson, because ostensibly it would cost the City $10,000 to retrieve it.

The Court finds that City officials wilfully withheld new and material evidence from the

Mediation Committee during the December 2008 hearings.  The Court further finds that the

City's conduct, calculated to deprive Robinson of compensation as a labor foreman, was

egregious, outrageous, and shocking to the Court's conscience.

## II.     Analysis and Conclusions of Law

The Court has subject matter jurisdiction under 28 U.S.C. § 1331 over Plaintiff's federal

claims; the Court exercises supplemental jurisdiction over the KWPA claim pursuant to 28

U.S.C. § 1367.   The City is a Kansas municipality and the Court properly exercises personal

jurisdiction over it.  Venue properly rests with this Court.

Plaintiff brought four claims that were tried to the Court: race discrimination in violation

of Title VII, deprivation of procedural due process under § 1983, deprivation of substantive due

process violation under § 1983, and a violation of the KWPA.  The Court discusses each in turn.

### A.     Title VII

Robinson claims that the City discriminated against him because of his race, in violation

of Title VII, when it failed to classify and compensate him as a Labor Foreman.  Under Title VII,

it is an unlawful employment practice to "discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's

race."[15]  At trial, "the ultimate test is whether plaintiff has produced enough creditable evidence

to persuade the trier of fact that defendant acted with discriminatory intent and that such intent

caused plaintiff's injury."[16]  A plaintiff can prove intentional discrimination by direct or

---

[15]42 U.S.C. § 2000e-2(a)(1).

[16]*Dodoo v. Seagate Tech., Inc.*, 235 F.3d 522, 528 (10th Cir. 2000) (citations omitted).  Defendant did not argue at trial that Plaintiff could not establish a prima facie case of discrimination.  To establish a prima facie case of race discrimination, Robinson must show that (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of

circumstantial evidence.  Proof that the defendant's nondiscriminatory explanation for the adverse employment action is unworthy of credence is "one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."[17]  And "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision."[18]  "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[19]

As noted, the City asserts several nondiscriminatory explanations for why Plaintiff was not promoted, and argues that his nonpromotion itself explains why he was not classified and paid as a labor foreman.  To review, the City contends that (1) City Manager approval was required for promotions and that neither Russell nor Archer approved Robinson's promotion by completing a PAF; (2) there was no classification in the pay ordinance for "sanitation foreman," (3) the labor foreman classification had not been approved in the budgeting process; (4) Plaintiff was not performing sanitation foreman duties; and (5) Plaintiff was not qualified for the sanitation foreman position.  Plaintiff addressed each of the City's proffered nondiscriminatory

---

discrimination.  *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 & n.5 (10th Cir. 2007).  It is undisputed that Robinson is a member of a protected class and that the failure to classify and pay him as a labor foreman is an adverse employment action.  For the same reasons explained in the Court's pretext analysis, the Court finds that the challenged action took place under circumstances giving rise to an inference of discrimination.

[17]*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000); *see also Townsend v. Lumbermens Mut. Cas. Co.*, 294 F.3d 1232, 1241 (10th Cir. 2002).

[18]*Reeves*, 530 U.S. at 147.

[19]*Townsend*, 294 F.3d at 1242.

explanations for its actions, pointing to evidence that they are unworthy of credence.

As explained in the Court's detailed findings of fact, the Court agrees that the City's witnesses were generally not credible and that their stated explanations are unworthy of belief. The Court also credits Mary Bartlett's testimony that Robinson was promoted, and her April 2008 letter documenting her perception that racism was involved in Baugher's treatment of Robinson.  His family hosted a surprise party, attended by several City employees, celebrating his promotion as the first black in a foreman position in the Public Service department.   There is no clear nondiscriminatory explanation for the City's decision not to properly classify and pay Robinson after he was promoted.  This finding permits the Court to conclude that the City unlawfully discriminated against Robinson.[20]   The City's longstanding efforts to cover up his promotion, coupled with the fact that similarly situated employees were properly classified and paid, leads this Court to conclude that the City intentionally discriminated against Robinson.

Pretext is often demonstrating by a showing that non-protected individuals were treated more favorably for comparable conduct.[21]  "Similarly-situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."[22]  To determine whether employees are similarly situated, the Court "should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees."[23]  The

---

[20]*Reeves*, 530 U.S. at 148.

[21]*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000).

[22]*Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 922–23 (10th Cir. 2004) (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997)) (internal quotation marks omitted).

[23]*McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006).

parties presented an issue of fact on the appropriate comparators to Robinson.  Robinson urged

that he was treated less favorably than other non-African-American supervisors in the Public

Works department such as Tapia, Jacobs, and Blass.  The City argues that Robinson should be

compared to Nichols, whose job responsibilities became Robinson's in the summer of 2007.  As

explained in the Court's findings of fact, Tapia, Jacobs, and Blass are the proper comparators

because, as supervisors, they shared Baugher as a supervisor, they were subject to generally the

same performance standards and discipline, and they shared relevant employment circumstances.

While Robinson was held to the same standards as these individuals, he was classified and paid

less.  Nichols, by comparison, was not considered a supervisor in the same way that Robinson

was and was in fact passed over by Baugher for the foreman position because he was unwilling

to take on the extra responsibilities and training that Robinson agreed to take on.  In fact,

Robinson evaluated Nichols, a MWIII, but there is no evidence that Nichols ever evaluated

Robinson before his promotion when Nichols supposedly held the same duties.  This evidence

further convinces the Court that the City had a discriminatory motive in failing to classify and

compensate Robinson for the work he was performing.

Finally, the City urges in its proposed conclusions of law that the Court should focus on

the honest beliefs of the decisionmaker at the time of the decision, in this case Archer or the

Mediation Committee, in determining discriminatory intent.[24]  At the time of the initial decision

not to classify and pay Robinson as a labor foreman, Baugher was his supervisor and Russell was

the City Manager.  As described in the Court's findings of fact, they had been working together

prior to Robinson's promotion to reorganize the Public Works department and to rewrite job

---

[24]*See Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006).

descriptions.  The Court finds that Baugher, with Russell's approval, promoted Robinson and at some point subsequent to that promotion, realized that he could not obtain funding for both Robinson's position and a new assistant stormwater superintendent position, which he intended to fill several months later with Blass.[25]  Upon confronting Baugher about why his pay had not increased in conjunction with his new supervisory duties, Robinson was threatened with an accusation of insubordination and Baugher began removing all indicia that Robinson had been promoted.  The Court cannot find on the record before it that either Baugher or Russell had an honest belief in October 2007 that they had clearly communicated to Plaintiff that he was only being given Nichols' limited job responsibilities; all of the objective evidence suggests that they convinced Robinson that he had been promoted, only to deny him the pay increase that he was due in conjunction with that promotion and then to begin a process of covering up the objective evidence of the promotion.  Given that the Court finds much of the City witnesses' testimony not credible, it is unable to find that Baugher or Russell, at the time of the decision, had an honest belief that they were merely asking Robinson to take over the responsibilities of Nichols, another MWIII.

The trial record does not conclusively reveal "some other, nondiscriminatory reason for the employer's decision,"[26] and Robinson presented a strong case that the City's stated reasons are untrue.  The record reveals that the City promoted Robinson and undertook to conceal evidence of the promotion in order to avoid classifying and paying him more under the Pay Ordinance, while at the same time reaping the benefits of his increased responsibilities and

---

[25]Because the Court finds that Baugher had the authority to promote Robinson, he is an appropriate decisionmaker for purposes of this analysis.

[26]*Reeves*, 530 U.S. at 148.

duties—he supervised many employees and was able to get the sanitation division's overtime problem under control.  The Court concludes, as stated in its findings of fact, that the only explanation for the City's failure to follow through on Plaintiff's promotion is unlawful discrimination.

**B.      Due Process Claims**

The Fourteenth Amendment provides that the states shall not "deprive any person of life, liberty, or property, without due process of law."[27]  Procedural due process claims are evaluated by asking first, "whether there exists a liberty or property interest which has been interfered with by the State," and second, "whether the procedures attendant upon that deprivation were constitutionally sufficient."[28]  The Due Process clause also contains a substantive component, "barring certain government actions regardless of the fairness of the procedures used to implement them."[29]  Substantive due process "provides protection against arbitrary and oppressive government action, even when taken to further a legitimate governmental objective."[30]  Here, Robinson asserts procedural and substantive due process claims, both premised on his contention that the City deprived him of his right to be properly classified and compensated in his employment.  For his procedural due process claim, Robinson argues that he was not provided with the requisite notice and opportunity to be heard, because at the mediation hearing, the City altered material evidence presented to the Mediation Committee, and that the

---

[27]Const. amend. XIV, § 1.

[28]*Lauck v. Campbell Cnty.*, 627 F.3d 805, 811–12 (10th Cir. 2010) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).

[29]*Seegmiller v. LaVerkin City*, 528 F.3d 762, 766 (10th Cir. 2008).

[30]*Id.* at 767.

City Manager communicated with a Committee member ex parte.  Robinson's substantive due

process claim is that the City's deprivation of his property interest in being properly classified

and compensated was arbitrary, capricious, and pretextual.

### 1.    Property Interest

The City first contends that the due process claims fail because Robinson does not have a

protected property interest in the labor foreman classification and pay grade.  "The existence of a

property interest is defined by existing rules or understandings that stem from an independent

source such as state law-rules or understandings that secure certain benefits and support claims

of entitlement to those benefits."[31]  These sources may include municipal charters or ordinances,

and express and implied contracts.[32]

> Procedural detail in a statute or regulation, standing alone, is not
> sufficient to establish a protected property interest in an
> employment benefit.  However, if the statute or regulation places
> substantive restrictions on the discretion to demote an employee,
> such as providing that discipline may only be imposed for cause,
> then a property interest is created.[33]

Whether a property interest exists is a question of law.[34]  The Court has already found on

summary judgment that if the factfinder in this case determines Robinson was promoted to the

labor foreman position, then he has a property interest in the classification and pay grade for that

new position.  The Court concluded that the City's policies amount to more than procedural

---

[31]*Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998) (quotation omitted).

[32]*Schultz v. City of Longmont, Colo.*, 465 F.3d 433, 444 (10th Cir. 2006) (citing *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005)).

[33]*Hennigh*, 155 F.3d at 1254.

[34]*Burns v. Bd. of Comm'rs of Cnty. of Jackson, Kan.*, 197 F. Supp. 2d 1278, 1287 (D. Kan. 2002) (citing *Tarabishi v. McAlester Reg. Hosp.*, 827 F.2d 648, 651 (10th Cir. 1987)).

protections: they created a protected property interest in the correct classification and compensation for employees who are in fact promoted.  The Court has found that Robinson was promoted to the labor foreman position; thus, he has a protected property interest in the corresponding classification and pay grade.  Because the City continued to classify and pay Robinson as a MWIII, despite his promotion, it interfered with his property interest.

## 2.     Procedural Due Process

The next step in the analysis of Robinson's procedural due process claim is to determine whether he was provided with sufficient process.  The essential requirements of due process are notice and an opportunity to respond.[35]  There must be an opportunity for the public employee to present his side of the case.[36]  The City contends that Robinson was provided with sufficient process because he was given notice and an opportunity to be heard through the Mediation Committee process, during which he was represented by counsel.  But Robinson's procedural due process claim is not premised on the failure to provide notice or a hearing.  His claim is premised on the City's interference with and manipulation of the mediation hearing by (1) submitting an altered Sanitation Foreman job description and representing it was the one that Robinson was provided in October 2007; (2) submitting altered job descriptions for Tapia and Jacobs omitting the job code and pay grade numbers; (3) withholding metadata information requested by Robinson and the Mediation Committee; (4) misrepresenting the job classification and budgeting process to the committee; (5) falsely testifying that the Sanitation department reported to the Streets department, and therefore through Jacobs; (6) making ex parte

---

[35]*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).

[36]*Id.* at 543, 546.

communications to the Committee, which included new and material information about Blass's appointment, and telling one committee-member that the City's cost of providing metadata would be $10,000.

The City interfered with Robinson's right to procedural due process by failing to provide him with a meaningful opportunity to respond to certain evidence produced by the City, and by modifying and misrepresenting the origin and properties of documents material to the promotion determination.[37]  The Court has previously found that ex parte communications did take place between Archer and Paton and that this information was new and material.[38]  The Court has also found that Baugher modified documents to delete the code and grade from the Sanitation Foreman job description in order to make it appear that Robinson had not been promoted.  In addition to manipulating key documents provided to the Mediation Committee, the City argued that in fact Robinson had modified the job description he provided as evidence of his promotion. The Mediation Committee was misled, which materially affected its decision that Robinson was not promoted, and resulted in an unfair hearing.  Under these circumstances, Robinson has established a violation of his right to procedural due process.

### 3.    Substantive Due Process

To show that the City violated his substantive due process right to be properly classified and paid, Robinson must also show that the City's challenged action was arbitrary, capricious, or

---

[37]*See Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 580–81 (10th Cir. 1996); *Stone v. FDIC*, 179 F.3d 1368, 1376–77 (Fed. Cir. 1999).

[38]*See Stone*, 179 F.3d at 1377 (explaining that ex parte communications that "introduce new and material information to the deciding official will violate the due process guarantee of notice.").

30

without a rational basis.[39]  Government action is arbitrary where it "shocks the conscience."[40] Due process is "'not a guarantee against incorrect or ill-advised personnel decisions.'"[41] But "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."[42]

Robinson argues that the City's conduct was arbitrary or capricious because its justifications were pretextual, it intentionally and deliberately chose not to place Robinson in the appropriate classification and pay grade, City officials ignored evidence that it had misclassified Robinson even after conducting an investigation, and it was not based on the conscientious, careful, and deliberate exercise of professional judgment.

The Court agrees that the City's decision not to classify Robinson as a labor foreman was pretextual for the reasons explained on the Title VII claim.  The Court also agrees that the City's actions in covering up Robinson's promotion and misleading the Mediation Committee were arbitrary and capricious.  This conduct was intentional and prolonged—City documents were altered at the time of the hearing both to counter Robinson's reliance on the October 2007 job description, and to alter the organizational chart in the Handbook, which impacted the supervisor for whom the City argued Robinson worked.  The Court finds that this conduct shocks the conscience because the City to intentionally and deliberately covered up evidence that supported Robinson's claim that Baugher had promoted him.

---

[39]*Crider v. Bd. of Cnty. Comm'rs of Cnty. of Boulder*, 246 F.3d 1285, 1289 (10th Cir. 2001); *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1257 (10th Cir. 1998).

[40]*Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998).

[41]*Curtis v. Okla. City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1215 (10th Cir. 1998) (quoting *Bishop v. Wood*, 426 U.S. 341, 350 (1976)).

[42]*Lewis*, 523 U.S. at 849.

31

4.        **Municipal Liability**

Having determined that a constitutional violation occurred, the Court next turns to the question of municipal responsibility.  The City cannot be held vicariously liable for the acts of its agents; the City will only be held liable if it "can be fairly said that the city itself is the wrongdoer."[43]  The City may be liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."[44]

Robinson argues that the City may be liable based on the following: (1) Archer, the City's final policymaker for personnel actions, denied Robinson's grievance and ratified Baugher's decision in August 2008; (2) the City's custom of requiring its employees to perform duties in a higher job classification without compensation; (3) the City opposed and unlawfully interfered with Robinson's grievance at the December 2008 hearing, continuing to maintain that its conduct was lawful and required by City policies when in fact it was not.  The Court agrees that the City is subject to *Monell* liability under the first and third theory of liability.  Robinson's procedural and substantive due process claims are largely based on the City's actions with regard to the grievance process.  The Court has found that the City interfered with the mediation process by manipulating evidence and communicating with a committee member ex parte, presenting that committee member with new and material information that clearly influenced that body's decision.  Ironically, the City pursued its pretextual defense of its actions before the Mediation Committee while simultaneously accusing Robinson of manipulating the key piece of

---

[43]*Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 122 (1992).

[44]*Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978).

32

evidence tending to show he had in fact been promoted.

These decisions can be attributed to the City itself.[45]  Archer and other City employees interfered with the grievance process.  And regardless of whether Archer or the Mediation Committee constitute the "final policymaker" on personnel issues, both ratified Baugher's pretextual decision not to classify and promote Robinson.  Moreover, while the Mediation Committee may be the final policymaker with respect to personnel decisions, the due process claims also allege procedural interferences with the mediation process itself; interferences committed by Archer, Baugher, and others that amounted to a concerted effort to remove all evidence that Robinson was promoted.  The Court finds that under the circumstances of this case, the City itself was the wrongdoer and is properly subject to liability.

### C.    KWPA Claim

The KWPA states that "[e]very employer shall pay all wages due to the employees of the employer at least once during each calendar month."[46]  The statute defines "wages" as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis less authorized withholding and deductions."[47]  When an employer willfully fails to pay an employee his or her "wages due," the employer is liable for both the wages due and a penalty in an amount up to 100% of the unpaid wages.[48]

---

[45]*City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."); *Melton v. City of Oklahoma City*, 879 F.2d 706, 724–25 (1989), *on reh'g*, 928 F.2d 920 (10th Cir. 1991) (finding municipal liability where City Manager, who was final policymaker, ratified the subordinate's actions).

[46]K.S.A. § 44-314(a).

[47]*Id.* § 44-313(c).

[48]*Id.* § 44-315(b).

"The KWPA, then, does not provide plaintiffs with any substantive rights, but simply provides a mechanism for plaintiffs to recover wages due.  In such circumstances, plaintiffs must establish independently that they are entitled to the wages that they seek."[49]  For the reasons set forth in detail in the Court's findings of fact, the City willfully failed to pay Robinson his wages due as contemplated by the KWPA.

### D.      Damages

Based on the Court's findings of fact and conclusions of law, the City is liable to Robinson under Title VII, 42 U.S.C. § 1983, and the KWPA.  The measure of Robinson's past economic damages for his due process and Title VII claims and of unpaid wages under the KWPA is the same: the amount of earned, but unpaid, wages from September 1, 2007, to October 31, 2012—$24,286.74.

The City also is liable to Robinson for a penalty under the KWPA for its willful non-payment of wages in the amount of 1% of the unpaid wages for each work day the non-payment continued (up to 8 days) and 100% of the wages unpaid after the eighth day for all unpaid or untimely paid wages, including the $3,692.97 in backpay wages that the City withheld from Robinson until after the Committee's decision.[50]   Robinson shall submit a calculation of the penalty owed through the date of Judgment within 21 days of the entry of the Court's Order.

The Court awards Robinson pre-judgment interest at Kansas's statutory rate of ten percent on the back wages owed him for his pendent state-law KWPA claim as "an element of plaintiff's complete compensation . . . for being deprived of the monetary value of his loss from

---

[49]*Garcia v. Tyson Foods, Inc.*, 766 F. Supp. 2d 1167, 1187 (D. Kan. 2011).

[50]K.S.A. § 44-315(b).

the time of the loss to the payment of the judgment."[51]  Robinson shall submit a calculation of the pre-judgment interest owed through the date of Judgment within 21 days of the entry of the Court's Order.

The Court finds that Robinson experienced emotional pain and suffering, inconvenience, humiliation, mental anguish, and loss of enjoyment of life.  Robinson went from the thrill of celebrating his promotion as the City's first African-American supervisor in PS&BG with his family and co-workers, to the embarrassment of being told he was not promoted and being forced, by formal discipline permanently placed in his personnel file, only to identify himself as an ordinary laborer (MWIII), while his non-African-American counterparts enjoyed both the status and the compensation that came with being a supervisor.  He endured the humiliation of being falsely accused, ever since December 2008 and as recently as during his trial, of fabricating a document to support his claim.  The Court therefore awards Robinson $150,000 in compensatory damages.

Robinson is still employed by the City, but the City has changed its pay structure in a way that prevents it from classifying or paying Robinson as a foreman in the future.  Therefore, in lieu of ordering the City to classify Robinson as a Labor Foreman, the Court awards future lost wages. This measure of damages is equal to the future economic loss Robinson is entitled to on his due process claims.  The Court concludes that Robinson is entitled to $72,724.91 in future economic loss, which is the present value of the estimated difference in future earnings up to age 65.

Finally, as the prevailing party on his section 1983 due process and Title VII race

---

[51]*Koch v. Koch Indus.*, 996 F. Supp. 1273, 1279-80 (D. Kan. 1998) (quotations and alterations omitted); *see also* K.S.A. § 16-201.

discrimination claims, the Court awards Robinson his costs and a reasonable attorney fees.[52]

Plaintiff shall submit an application for fees and expenses in accordance with Rule 54 and the

Court's local rule.

**III.     Conclusion**

    Based on the above stated findings of fact and conclusions of law, the Court finds that

judgment should be entered in favor of Plaintiff and against the City on all counts.  Plaintiff is

awarded damages in the amounts set forth in this Order.  The City's oral motion for judgment as

a matter of law, raised at the close of Plaintiff's case and renewed at the close of evidence, is

denied.

        **IT IS SO ORDERED.**

Dated: December 14, 2012

                                              S/ Julie A. Robinson
                                             JULIE A. ROBINSON
                                             UNITED STATES DISTRICT JUDGE

---

[52]42 U.S.C. § 1988(b); 42 U.S.C. § 2000e-5(k).